# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

WILLIAM DESENA et al.,    )
    Plaintiffs         )
                       )
                       )
    v.                 )     CIVIL ACTION NO. 1:11-cv-117-
                       )          GZS-DBH-BMH
                       )
STATE OF MAINE et al.,    )
    Defendants      )

## BRIEF OF INTERVENOR MAINE DEMOCRATIC PARTY

Question Presented:

*Is Maine's statute requiring the redrawing of congressional districts once every ten years constitutionally defective because new decennial census figures show a population disparity of less than one percent, when there is no history of Voting Rights Act violations, partisan gerrymandering or unconstitutional conduct?*

    **A.**    *Is the current population variance between the districts per se unconstitutional?*
    **B.**    *Would the failure to redistrict before the 2012 elections be unconstitutional?*

## I.    <u>Facts and History</u>

Maine law has historically required redistricting for legislative seats, county commissioner seats and congressional seats to be done every ten

years. The Maine Constitution requires redistricting for *legislative* seats to be done in 1983 and every ten years thereafter.

In 1975 the Maine Constitution was amended to create a bipartisan commission with strict timeframes, to codify substantive standards to guide the commission and legislature, to allow the Maine Supreme Court to hear challenges and make the apportionment if the legislature fails, and to require that legislative reapportionment be done in 1983 and every tenth year thereafter. See, generally, In re 1983 Legis. App. of House, Senate, and Congressional Districts, 469 A.2d 819, 822-24 (1983), for a history of the Maine Constitution's provisions on redistricting.

Maine's procedure for redistricting creates a bipartisan 15-member commission, comprised of ten members each chosen equally by the partisan leadership in the legislature, two members representing the chairs of the major  political parties, three members of the public, including a neutral chair chosen by the other public members who essentially becomes the tie-breaking vote in the event of an impasse. The commission submits its plan to the legislature within 120 calendar days of the legislature convening in its first regular (or longer) session following receipt of the census data, generally in April of that year. Me. Const., Art. IV, pt.1, § § 2, 3; Art. IV, pt.2, § 2; Art. IV, pt.3, § 1-A.

The legislature must enact the commissioner's plan or a plan of its own by a supermajority vote of both houses within 30 calendar days after the commission's plan is submitted. If the legislature fails to make an apportionment within 130 calendar days of convening, the Maine Supreme Judicial Court must make the apportionment within 60 days of that time, taking into consideration any plans, briefs or other submissions filed during the first 30 days. The Maine Supreme Judicial Court also has original jurisdiction to hear any challenge to an apportionment enacted by the legislature and, if the court sustains a challenge, the court must make the apportionment. Id.

The Maine Constitution does not, by its terms, permit redistricting in less than ten years.

While congressional redistricting is not in the Maine Constitution,[1] the statutory framework for congressional redistricting is closely tied with the constitutional procedures for legislative redistricting.  In order to keep the congressional effort in synch with legislative and county redistricting, the legislature amended the statute in 1993 to require that the congressional districts be redrawn in 1993 and every ten years thereafter, the same years that legislative redistricting is done. The legislature required that

---

[1] Only fourteen state constitutions mention the timing of congressional redistricting (Ariz., Cal., Colo., Conn., Haw., Idaho, Mo., Mont., N.J., S.C., Utah, Va., Wash., and Wyo.). See Georgetown Law Journal, vol. 95:1247, fn.51

congressional redistricting use the same tools and procedures as are employed in the legislative redistricting effort—a strictly bipartisan commission with tight legislative deadlines, a supermajority vote of both houses, apportionment by the Maine Supreme Judicial Court if legislative efforts fail, and direct recourse to the Maine Supreme Judicial Court for anyone challenging an apportionment. 21-A M.R.S. § 1206. The statute, by its terms, does not permit redistricting to take place less than ten years following the most recent apportionment.

Redistricting for county commissioner seats is also not found in the Maine Constitution but was codified in 1987 so as to employ the same apportionment commission, the same criteria and the same recourse to the courts as for legislative and congressional redistricting. 30-A M.R.S. § 65.

Maine's law on redistricting, including its statute on congressional redistricting, which embodies the historical practice of redistricting the congressional seats every ten years, has never previously been challenged and never been found to be constitutionally flawed.

The current apportionment of Maine's two congressional districts was developed and promulgated by the Maine Supreme Judicial Court, pursuant to 21-A M.R.S. § 1206 and Me.Const., art. IV, pt. 1, § 2; art IV, pt. 2, § § 1-1, because a supermajority of the legislature was unable to reach agreement,

despite consensus on a plan within the bipartisan apportionment commission. In re 2003 Apportionment of the State Senate and United States Congressional Districts, 2003 ME 86, 827 A.2d 844 (2003).

The Maine Supreme Judicial Court held two public hearings and invited submissions and comments from all interested persons. Id., ¶¶ 2, 3. The Court ultimately issued an apportionment which accomplished the following:

It maintained the longstanding presence of Knox County in the First Congressional District; it reduced the added square miles and travel challenges of the Second District from the court's own original proposal; it minimized divisions of counties and municipalities; it preserved communities of interest; it moved fewer communities into different districts in order to maintain continuity of representation, preserving the core of existing districts; and it achieved a population differential of 23 people, for a population overall range of .01%. Id., ¶¶ 15-20. Cf. 21-A M.R.S. § 1206-A, defining "functionally contiguous and compact territory" in legislative redistricting as "one that facilitates representation by minimizing impediments to travel within the district," and defining "impediments" as including physical features such as mountains, rivers, oceans and discontinued roads or lack of roads. This statute also directs the

apportionment commission to "give weight to the interests of local communities when making district boundary decisions." PL 1995, c. 360, § 2.

The current congressional line drawn by the court thus borders twelve of Maine's sixteen counties and seventy-seven Maine communities but divides only one county and divides no cities or towns.

This statute is not the product of any unconstitutional scheme or device and no one suggests that it is. The court drew the line in 2003 not because of any constitutional infirmities on the part of the legislative effort but only because the legislature was unable to come to an agreement on where to draw the line. No party has suggested that the Maine Supreme Judicial Court's congressional redistricting plan adopted and promulgated in 2003 violated the population equality requirement of the United States Constitution or any other federal or state constitutional guarantee or statute.

Maine's statute that requires congressional redistricting to be undertaken according to the same carefully tailored, open and fair process as the Maine Constitution provides for legislative redistricting—including an independent commission, the requirement of a supermajority of the legislature and ultimately the entrustment of that process to the Maine Supreme Judicial Court—was the result of the good faith efforts of a

bipartisan legislature to coordinate redistricting efforts for the three distinct areas—congressional, legislative and county districts, allowing the same people to redraw the districts at the same time, with the same process and with the same longstanding criteria, encouraging an efficient, fair, transparent, nonpartisan and thoughtful process.

Intervenor Maine Democratic Party asserts that Maine has in place an orderly process for decennial redistricting that is geared to a January-June timetable, and that to require redistricting at this point in the cycle would threaten this unique, well-established structure for achieving fair, open, nonpartisan and independent redistricting. The congressional redistricting statute enjoys, as it should, a heavy presumption of constitutionality. On top of that, the deviations shown by the 2010 census are relatively modest and do not, as a practical matter, significantly enhance or diminish the vote of any Maine citizen in either district. In fact, Maine's scheme for redistricting provides time for policy makers and the state court to make a careful and thoughtful apportionment plan effectuating legitimate state policies, a result that an order requiring redistricting during the remainder of this year threatens, under the practical circumstances of this case, to disrupt.

## II.  Argument

**A.   The population deviation of less than one percent, which is the passive result of natural growth and not of recent redistricting itself, is not per se unconstitutional.**

The Supreme Court held that the United States Constitution requires an "orderly process for decennial redistricting" in Reynolds v. Sims, 377 U.S. 533 (1964).

Since Reynolds v. Sims, a number of cases have addressed population disparities, primarily in the context of gerrymandering complaints, Voting Rights Act violations and other allegations surrounding legislatively redrawn districts. See, e.g., Easley v. Cromartie, 532 U.S. 234 (2001); Upham v. Seamon, 456 U.S. 37 (1982); Larios v. Cox, 300 F.Supp.2d 1320 (N.D.Ga. 2004), *summarily. aff'd.,* 542 U.S. 947 (2004); Colleton v. McConnell, 201 F.Supp. 618 (D.S.C. 2002).  None of these cases have declared the failure to redistrict because of a population shift mid-decade, with nothing more, to be a constitutional violation.

The Supreme Court did permit a politically motivated mid-decade congressional redistricting scheme which replaced an older court-ordered apportionment, League of United Latin American Citizens (LULAC) v. Perry, 548 U.S. 399, 126 S.Ct. 2594 (2006); but the Court in no way mandated or even encouraged such mid-cycle redistricting, nor did it

undermine the once-per-decade rule established in <u>Reynolds</u> which is "justified by the need for stability and continuity in the organization of the legislative system." <u>Reynolds</u>, supra, 583.

The question posed by the plaintiffs is whether their votes are diluted by the natural progression of population shifts between districts within the ten-year period between redistricting.

Plaintiffs contend that the mere numerical difference between the districts renders the current congressional line constitutionally suspect, diluting their vote. Their contention ignores the fact that wide disparities inevitably exist during the mid-decade period and that disparities far greater than those that have developed here have been found not to require immediate redistricting.

Courts have adopted more flexible approaches to the numerical requirements for redistricting of legislative seats than for congressional redistricting. <u>Karcher v. Daggett</u>, 462 U.S. 725 (1983).  Deviations in population of less than 10% generally are permissible as "minor deviations" in state legislative plans. <u>Brown v. Thomson</u>, 462 U.S. 835 (1983).  Because of the primacy of Article 1, § 2 of the United States Constitution, however, the Supreme Court has imposed a stricter mathematical standard for congressional redistricting and in one case disallowed a legislatively enacted

plan with a range of less than one percent when that deviation could not be justified as necessary for the achievement of a consistently applied, legitimate state interest. <u>Karcher v. Daggett</u>, supra.

In rejecting a one percent benchmark for Congressional districts, however, the Supreme Court did not find the congressional plan in <u>Karcher</u> to be unconstitutional *per se*. Rather, the Court indicated that:

> "[a]ny number of consistently applied legislative policies might justify some variance, including, for instance, making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent Representatives. As long as the criteria are nondiscriminatory, [citations omitted], these are all legitimate objectives that on a proper showing could justify minor population deviations." <u>Karcher</u>, supra, 740-41.

Federal courts are cautioned to consider the "character as well as the degree of deviations from a strict population basis," <u>Reynolds</u>, supra, 581, and to permit population variations which are "entirely the result of the consistent and nondiscriminatory application of a legitimate state policy." <u>Brown</u>, supra, 845. Where there is no taint of arbitrariness or discrimination, "substantial deference is to be accorded the political decisions of the people of a State…." <u>Brown</u>, supra, 847-48, quoting <u>Roman v. Sincock</u>, 377 U.S. at 710. See also, <u>Turner v. Arkansas</u>, 784 F.Supp. 585 (E.D. Ark.1991), *summarily aff'd.,* 504 U.S. 952 (congressional redistricting upheld with .735% maximum deviation from ideal).

Intervenor Maine Democratic Party submits that a variance of .652% in Maine's congressional districts, which is not the product of deliberate malapportionment but only the temporary result of passive population growth following a lawful apportionment during the ten-year period following that apportionment, meets the constitutional population equality requirements under all the circumstances.

Maine's current congressional lines are not tainted by arbitrariness, discrimination or unlawful purpose. Indeed, no one has suggested that these districts, when they were drawn and adopted by the Maine Supreme Judicial Court, were not the product of an independent, good faith, open, fair and nonpartisan process or that they did not effectively implement numerous legitimate state policies or that they were in any way constitutionally suspect. The small population disparities that now exist between the districts are, rather, the result of a natural shift in population, a mild manifestation of the kind of mid-decade shift that was fully acknowledged by the United States Supreme Court in Reynolds v. Sims, supra.

The current district line reflects population trends between the two districts over a long period of time, and the mere fact of this natural progression of Maine's demographics, within the ten-year period allowed by Reynolds v. Sims, does not render the current line unconstitutional.

In drawing the current districts only eight years ago, the Maine Supreme Judicial Court recognized and implemented legitimate and important state policies respecting the contiguity and compactness of districts, municipal and county boundaries, communities of interest and the need to draw lines that least disrupt existing districts so as to provide continuity of representation. In re 2003 Apportionment, supra.

The current variance continues to reflect those valid state policies relating to compactness and contiguity of electoral districts, the integrity of political subdivisions, and geographical considerations which were incorporated into the redistricting by the Maine Supreme Court in 2003. The apportionment creating the current congressional districts was the product of an honest and good faith effort to construct districts of as nearly equal population as was practicable. Karcher, supra; Reynolds v. Sims, 377 U.S. 533, 568, 577 (1964); Wesberry v. Sanders, 376 U.S. 1 (1964).

As a practical matter, plaintiffs' argument ignores the far greater, and equally inevitable, disparity in population among congressional districts nationwide, rendering the disparity between Maine's two districts minimal as a practical matter.

Based on the 2010 Census apportionment, each member of the United States House of Representatives will represent, on average, a population of

710,767.   http://2010.census.gov/2010census/data/apportionment-data.   In

Maine, the First Congressional District now has a population of 668,515 and

the Second District has a population of 659,846 residents.[2] The population of

each Maine's districts remains well below the national average; the voting

influence of the citizens in Maine's districts, by comparison, is actually

enhanced, not diluted, by the new census figures.

Compared with the other states that have two congressional districts,

the disparity between Maine's two district populations also appears

relatively insignificant. Maine is among the thirty-two states for whom the

number of congressional seats does not change. Hawaii, Idaho, Rhode

Island, New Hampshire and Maine will continue to have only two seats in

Congress.

The two congressional districts in Idaho are now 116,278 people apart

(Idaho's First Congressional District is at 841,930 and its Second

Congressional District is at 725,652 population), Id., and even when those

numbers are brought even, each district will have at least 120,000 more

people than either of Maine's congressional districts if divided equally

(1,567,582 divided by two = 783,791 minus 664,180, one half the total

population of Maine of 1,328,361).

---

[2] The census figures for redistricting do not include overseas population—military people,
diplomats and their families living abroad.

Alaska, Montana, Wyoming, North Dakota, South Dakota, Delaware and Vermont continue to have one congressional seat. The population of these states varies widely, even though they have the exact same number of seats in Congress. According to the 2010 census, these states, with a single congressional district, have the following population:

Alaska:          710,231
Delaware:        897,934
Montana:         989,415
North Dakota:    672,591
South Dakota:    814,180
Vermont:         625,741

The single congressional district in the largest of these states, Montana, will have a population that is 320,900 greater than the current population of Maine's Second Congressional District, a disparity justified only by the fluke of the mathematical division of the entire country by 435 with the preservation of one minimum district per state. This disparity, although constitutionally authorized, nevertheless dilutes the votes of Montana citizens to a substantial degree and correspondingly enhances the votes of Maine's citizens in both of its congressional districts.

The disparity between Maine's two Congressional Districts, 8,660 people, or app. 0.652% of the entire Maine population, is far less than the disparity between either of Maine's districts and the congressional districts of other similarly apportioned states.

14

For all these reasons, the Maine Democratic Party submits that the answer to the Court's first question – "is Maine's apportionment scheme, as laid out in the Maine Constitution and relevant state statutes, unconstitutional per se with respect to Congressional districts,"-- is "No."

**B.    The small numerical disparity between the two congressional districts does not rise to the level of making the carefully constructed Maine statute for orderly and independent redistricting unconstitutional.**

The Maine statute is clothed with the presumption of constitutionality. A statute is presumed to be constitutional and the person challenging the constitutionality has the burden of establishing its infirmity. McDonald v. Board of Election Commissioners, 394 U.S. 802, 809 (1969); Schlib v. Kuebel, 404 U.S. 357, 364 (1971); Estate of Branson v. O.F. Mossberg & Sons, 221 F.3d 1064, 1065, fn.4 (8th Cir. 2000).

In Karcher, supra, the Court described a two-part test. If plaintiffs prove that a redistricting plan was not the product of a good-faith effort to achieve population equality, then the burden shifts to the state "to prove that the population deviations…were necessary to achieve some legitimate state objective." Id., 740; Kirkpatrick v. Preisler, 394 U.S. 526, 532 (1969). The state may fulfill this burden by demonstrating that the variance is the result of neutral and nondiscriminatory, longstanding state policies, such as

15

keeping districts compact, respecting political subdivisions, not pairing incumbents, and the like. Karcher, supra, 740.

In Reynolds v. Sims, 377 U.S. 533 (1964), the Supreme Court held that redistricting once every ten years is constitutionally sufficient, acknowledging the natural population shifts but finding them constitutionally acceptable in light of the legitimate state interest in stability and continuity of representation. Reapportionment once every ten years, the Court said, would be a "rational approach to readjustment of legislative representation," reasoning that "limitations on the frequency of reapportionment are justified by the need for stability and continuity in the organization of the legislative system." Id., 584.

In Bacon v. Carlin, 575 F.Supp. 763, aff'd, 446 U.S. 966 (1984), a three-judge court held that Kansas was not constitutionally compelled to redistrict legislative districts in less than ten years even when new census data became available. The District Court basically found that a state legislature which validly reapportioned its legislative districts gains a ten-year 'safe harbor' protecting it from further reappointment no matter what factual or statutory changes occur. There was no suggestion that the earlier apportionment scheme was unconstitutional when enacted. The Supreme Court summarily affirmed.

16

In <u>Black Political Caucus v. Connolly</u>, 1992 WL 605665 (D.Mass. 1992), the three-judge court declined to order Massachusetts to move up its legislative reapportionment as soon as the census figures arrived, reading <u>Bacon v. Carlin</u> as holding that, "absent a ten-year span between reapportionments, the Equal Protection Clause is not violated by a failure to reapportion simply because newer, more accurate population data is available." <u>Id</u>., 2.

While <u>Reynolds</u>, <u>Bacon</u> and <u>Connolly</u> were legislative redistricting cases, not congressional redistricting cases, the Supreme Court has not indicated that it would view the timing of congressional redistricting in a different manner. Cf. <u>Turner v. Arkansas</u>, supra.

Just this week, a three-judge court in Mississippi declined to order legislative redistricting ahead of the state's adopted, orderly schedule in the face of a severe malapportionment under the new census figures. The Mississippi Constitution requires redistricting by the legislature during its regular session the second year following the census. The court found that neither the state nor the United States Constitution required the legislature to reapportion itself until next year, even though another election will occur under the present districts in the meantime.

Relying on Reynolds v. Sims in rejecting the idea that redistricting had to be done before the next election after the census figures arrived, the court observed that redistricting once every ten years is all that the constitution requires:

> "It is obvious that hardly a year passes after reapportionment that citizens are not denied their one-person, one-vote constitutional right. Hurricanes, floods, tornadoes, economic conditions, etc. constantly cause population shifts that leave the one-person, one-vote principle in shambles. Purity in protecting this constitutional right is, as the Supreme Court has recognized, so impractical as to be impossible." Mississippi State Conference of the NAACP v. Barbour et al., No. 3:11cv159, slip op, 3 (USDist.Ct., So.Dist.Miss., Jackson Div., May 16, 2011).

Plaintiffs in the Mississippi case specifically urged the court to speed up redistricting because of dictum in a footnote suggesting that the federal court might "ensure that the districts comply with the one-person, one-vote mandate before the next election" in cases where the population has changed and new census figures have been released. Ashcroft v. Georgia, 539 U.S. 461, 509, fn.2 (2003).

The Mississippi court rejected the notion that this footnote undermined Reynolds' holding that redistricting need be done only every ten years. The note of caution contained in Ashcroft was issued in the context of a denial of a Voting Rights Act preclearance and in response to the Ashcroft dissent's opposition to "'any inquiry into the benchmark plan using the

census numbers in effect at the time the redistricting plan was passed.'"

Mississippi, 14, citing Ashcroft, 539 U.S. 461, 488, n.2.

The Ashcroft Court "did not hold that a state must redistrict to account for changes or shifts in population in the same year that census numbers are released, nor did it hold that a state's plan for decennial reapportionment would not be adequate to maintain a reasonably current scheme of legislative representation." Id.

Here, the small disparities (.652%) are merely the natural result of passive population growth; they are not attributable to any deliberate effort not to achieve equality. There is no history of Voting Rights Act violations, partisan gerrymandering or discriminatory conduct. This is not a case that calls for an extraordinary remedy by a federal court. The disparity, rather, is the product of legitimate judgmental choices made in the adoption of the orderly scheme for decennial redistricting that Reynolds endorsed and in the open and considered course of the previous redistricting maps drawn and promulgated by the Maine Supreme Judicial Court pursuant to a carefully thought through procedure and respecting numerous legitimate and traditional state redistricting interests.

Contrary to the assumptions underlying plaintiffs' complaint, redistricting is not a simple matter of dividing a paper map of Maine in two

mathematically equal portions. The physical and demographical realities of this state demand otherwise.

"Equal representation for equal numbers of people is a principle designed to prevent debasement of voting power and diminution of access to elected representatives." Kirkpatrick v. Preisler, 394 U.S. 526, 531 (1969).

Maine's Second Congressional District is already the largest congressional district east of the Mississippi. In re 2003 Apportionment, supra, ¶ 15.  The burden of travel for a Member of Congress to visit his or her constituents is a common and well-accepted factor in redistricting. Id. It is a factor that is important to the protection of the rights of voters. What good is the right to vote for a representative if that representative cannot maintain effective contact with his or her constituents?

Plaintiffs complaint suggests that their individual votes are diluted solely by the mere inequality in population of the districts.  Saying a vote is diluted, however, begs the question of how and to what extent the vote is diluted. Is not a vote diluted if, by the surgery of shear mathematical redistricting, the district grows over the following four or five years, expectedly, at a rate quite disproportional to the rate of growth of a neighboring district? Is a vote not diluted, as a practical matter, if the voter has little access to the Member of Congress because of distance, geography

and a lack of modern means of communication, not factored into a careless and hurried redistricting process?

Diminution of access to Maine's Members of Congress was a major factor in the establishment of the current district lines, reducing travel burdens in the Second Congressional District, minimizing division of political lines and communities of access, in accordance with the principles of fair and effective representation. In re 2003 Apportionment, supra, ¶¶ 15-16. These valid principles, designed to enhance the democratic process, not to denigrate it, should be respected and preserved.

The 125th Maine Legislature, which convened on December 1, 2010, is in the final weeks of its first regular session,  scheduled to adjourn on June 15, 2011. The legislature is next scheduled to convene on January 4, 2012, per Article IV, pt.3, § 2 of the Maine Constitution, for the conduct of particular items of business, absent the call of the Governor or some other emergency requiring a special session.

Despite the impracticality of conducting redistricting at this juncture, however, the question is not, *could* it be done this year, but, rather, is the 1993 statute that provides for a complex but orderly process for decennial redistricting in conformity with enlightened principles unconstitutional?

Does the constitution *require* that redistricting be done this year, which at this late date would put that carefully constructed state framework at risk; and shall the state's policy of conducting redistricting in conjunction with state legislative and county commission seats, in a methodical, thoughtful, open and deliberative manner, with due consideration for maintaining continuity and communities of interest, be overridden by a plaintiff insistent on immediate—but only fleeting—and fundamentally artificial mathematical equality between the districts?

Intervenor Maine Democratic Party submits that the answer to this, the Court's second question, also is "No".

## IV.  Conclusion

In view of the citations of authority and arguments above, Intervenor Maine Democratic Party respectfully requests that this Honorable Court deny the relief requested by Plaintiffs.

Dated at Augusta, Maine this 20th day of May, 2011.

Respectfully Submitted,
Maine Democratic Party
By Their Attorneys,
PRETI FLAHERTY BELIVEAU &
PACHIOS, LLP

By:    /s/ Janet T. Mills
Janet T. Mills

45 Memorial Circle
P. O. Box 1058
Augusta, ME  04332-1058
Telephone:  (207) 623-5300
Facsimile:   (207) 623-2914

## CERTIFICATE OF SERVICE

I, Janet T. Mills, hereby certify that I electronically filed Brief of Intervenor

Maine Democratic Party with the CM/ECF system, which will send notification of such

filing(s) electronically to the following:  Timothy C. Woodcock at

twoodcock@eatonpeabody.com, William J. Schneider, Attorney General at

william.j.schneider@maine.gov, and Paul Stern, Assistant Attorney General at

paul.d.stern@maine.gov.

Dated:  May 20, 2011

<div style="margin-left:40%">

Respectfully Submitted,
Maine Democratic Party
By Their Attorneys,
PRETI FLAHERTY BELIVEAU &
PACHIOS, LLP

By:     /s/ Janet T. Mills
Janet T. Mills

45 Memorial Circle
P. O. Box 1058
Augusta, ME  04332-1058
Telephone:  (207) 623-5300
Facsimile:   (207) 623-2914

</div>