# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | | |
|---|---|---|
| WILLIAM DESENA and SANDRA W. DUNHAM, | ) ) ) | |
| Plaintiffs, | ) | Docket No.  1:11-cv-117-GZS-DBH- |
| v. | ) | BMS |
| STATE OF MAINE, et al., | ) ) | |
| Defendants. | ) ) ) | |

## STATE DEFENDANTS' OPENING BRIEF

## QUESTIONS PRESENTED

1.  Is Maine's apportionment scheme, as laid out in the Maine Constitution and relevant state statutes, unconstitutional per se with respect to Congressional districts?

2.  Having received the relevant 2010 Census data, is it unconstitutional for Maine not to engage in redistricting of its Congressional districts prior to the 2012 election cycle?

## CONSTITUTIONAL AND STATUTORY BACKGROUND

**Federal Law.**  Article I, section 2 of the United States Constitution provides:

The House of Representatives shall be composed of Members chosen every second Year by the People of the several States... Representatives ... shall be apportioned among the several States which may be included within this Union, according to their respective Numbers, which shall be determined by adding to the whole Number of free Persons....[1] The actual Enumeration shall be made within three Years after the first Meeting of the Congress of the United States, and within every subsequent Term of ten Years, in such Manner as they shall by Law direct.

Within one week after the first regular session of Congress following a federal decennial census, "the President shall transmit to the Congress a statement showing the whole number of persons in each State, ... and the number of Representatives to which each State would be entitled under an apportionment of the then existing number of Representatives by the method known as the method of equal proportions, [and] no State to receive less than one Member."  2 U.S.C. § 2a(a).  The Clerk of the House of Representatives must, within fifteen calendar days after the receipt of this statement, "send to the executive of each State a certificate of the number of Representatives to which such State is entitled...."  *Id.* at § 2a(b).  Within each state, "there shall be established by law a number of districts equal to the number of Representatives to which such State is so entitled, and Representatives shall be elected only from districts so established, no district

---

[1] This sentence was changed by the 14th Amendment, section 2, to read in pertinent part: "Representatives shall be apportioned among the several States according to their respective numbers...."  U.S. Const., 14th Amend., § 2.

to elect more than one Representative...." *Id.* at § 2c.  Pursuant to Public Law 94-171, tabulations of the population must be transmitted to each state within one year after the census date – i.e., by April 1, 2011 for the 2010 federal decennial census.

**Maine Redistricting.**   Presently, Maine law calls for both the federal Congressional districts and the state legislative districts to be reapportioned as a result of the federal decennial census during the third year following each census – *i.e.,* in 2013, based upon the 2010 census.

The Maine Constitution sets forth a process for redistricting of the Maine House of Representatives and Senate beginning in 1983 and every ten years thereafter.  Me. Const., art. IV, pt. 1, § 2 ("The Legislature which convenes in 1983 and every 10th year thereafter shall cause the State to be divided into districts for the choice of one Representative for each district."); art. IV, pt. 2, § 2 ("The Legislature which shall convene in the year 1983 and every tenth year thereafter shall cause the State to be divided into districts for the choice of a Senator from each district....")  *See* Const. Res. 1975, ch. 1; art. CXXVI (1975).

The process contemplates that within three days following the convening of the Legislature responsible for reapportionment, a Reapportionment Commission is to be established, with

members appointed as set forth in the Maine Constitution.  Me. Const., art. IV, pt. 3, § 1-A.[2]  The Commission has 120 days from the convening of the Legislature to submit its redistricting plan for legislative districts to the State Legislature, and the Legislature then has 30 days to "enact the submitted plan of the [C]ommission or a plan of its own by a vote of 2/3." *Id.* at art. IV, pt. 1, § 3 & pt. 2, § 2.   The legislative reapportionment, further, must be approved by the Governor.  *Id.*  If the Legislature "fail[s] to make an apportionment within 130 calendar days after convening, the Supreme Judicial Court shall, within 60 days following the period in which the Legislature is required to act, but fails to do so, make the apportionment." *Id.*

Congressional redistricting in Maine follows a similar course but is largely

---

[2] This section provides in pertinent part:

> The commission shall be composed of 3 members from the political party holding the largest number of seats in the House of Representatives, who shall be appointed by the Speaker; 3 members from the political party holding the majority of the remainder of the seats in the House of Representatives, who shall be appointed by the floor leader of that party in the House; 2 members of the party holding the largest number of seats in the Senate, who shall be appointed by the President of the Senate; 2 members of the political party holding the majority of the remainder of the seats in the Senate, to be appointed by the floor leader of that party in the Senate; the chairperson of each of the 2 major political parties in the State or their designated representatives; and 3 members from the public generally, one to be selected by each group of members of the commission representing the same political party, and the third to be selected by the other 2 public members.

statutory.  Prior to 1981, the Congressional districts were defined in statute and followed county lines.  *See* P.L. 1960, c. 395, § 1.  In 1981, the Legislature added an apportionment commission process for Congressional redistricting that was similar to, and timed to coincide with, reapportionment of legislative districts under the Maine Constitution.  It called for redistricting to occur "[i]n 1983 and every 10 years thereafter, when the Secretary of State has received notification of the number of congressional seats to which the State is entitled and the Federal Decennial Census population count is final."  P.L. 1981, c. 410, § 2, enacting former 21 M.R.S. § 1571-A.  The current version of this statute provides: "In 1993 and every 10 years thereafter, when the Secretary of State has received notification of the number of congressional seats to which the State is entitled and the Federal Decennial Census population count is final," the Apportionment Commission established for the state legislative districts, discussed above, "shall review the existing congressional districts" and "shall reapportion the State into congressional districts" "[i]f the districts do not conform to Supreme Judicial Court guidelines." 21-A M.R.S. § 1206(1).  "In making such a reapportionment, the commission shall ensure that each congressional district is formed of compact and contiguous territory and crosses political subdivisions the least number of times necessary to establish districts as equally populated as possible."  *Id.*

The process is virtually identical to that involving state legislative districts:

the Commission "shall submit its plan to the Clerk of the House of Representatives within 120 calendar days after the convening of the Legislature," the "Legislature shall enact the submitted plan of the [C]ommission or a plan of its own in regular or special session by a vote of  2/3 of the members of each house within 30 calendar days after the plan is submitted to the Clerk of the House of Representatives," and this action must be approved by the Governor.[3]  *Id.*   If the Legislature fails to enact a reapportionment plan, the Maine Supreme Judicial Court then has 60 days to make the apportionment.  *Id.* at § 1206(2).[4]

For the past three decades, Maine has performed reapportionment of congressional districts according to the same time frames and processes employed for legislative districts.  *See, e.g., In re 2003 Apportionment of the State Senate and United States Congressional Districts*, 2003 ME 86, 827 A.2d 844; *In re Legislative Apportionment of House, Senate and Congressional Districts*, 469 A.2d 819 (Me. 1983). Thus, both sets of districts were reapportioned in 1983, based on

---

[3] In addition, any legislatively adopted plan is appealable to the Maine Supreme Judicial Court, and if the appeal is sustained that court shall make the apportionment.  21-A M.R.S. § 1206(3).

[4] Of potential significance is a nonseverability provision in Maine law: "the apportionment of the Maine Senate, the Maine House of Representatives and Maine congressional districts ... become law as an entirety. If the apportionment of one or more of the bodies ... is rendered invalid or unlawful by a court of law, it is the intent of the Legislature that the apportionment of all of the bodies apportioned ... become void."  21-A M.R.S. § 1207(3*).*

the 1980 federal decennial census, in 1993 based on the 1990 census data, and in 2003 based on the 2000 decennial census.  The constitutionality of this approach has remained unchallenged until now.

**Maine Congressional Elections.**   The time frame for conducting Congressional elections in Maine is set forth in statute.  The key date is January 1 of the year in which the election is to be held – here January 1, 2012.  "A primary petition may be signed only by voters of the electoral division which is to make the nomination," and no earlier than January 1 of the election year in which it is to be used.   21-A M.R.S. § 335(2) & (6).   "For a candidate for Representative to Congress, at least 1,000 and not more than 1,500 voters" must sign the petition.  *Id.* at § 335(5)(C).   A primary petition must be turned in no later than "March 15th of the election year in which it is to be used."  *Id.* at § 335(8).   The primary elections are to be held on the second Tuesday of June "of each general election year."  *Id.* at § 339.

## FACTUAL BACKGROUND

The pertinent facts are not in dispute.  The population of Maine in the 2000 federal decennial census was 1,274,923.  *Stipulations,* ¶ 1.   After the reapportionment in 2003, using the 2000 census figures the number of people in Congressional District 1 was 637,450, and the number in District 2 was 637,473.

*Id.* ¶ 4.  The lines then drawn resulted in a deviation of 0.001804 percent from the ideal.[5]

The data from the 2010 federal decennial census was provided to the State of Maine, pursuant to federal law, on March 24, 2011.  *Stipulations,* ¶ 6.  The data shows that the population of Maine has increased to 1,328,361 residents. *Id.* ¶ 7. The number of Congressional districts in Maine has not changed as a result of the 2010 census, but the number of residents in each district has changed.  The 2010 data tallied 668,515 residents in Congressional District 1 and 659,846 in Congressional District 2, leaving a total deviation of 8,669 residents between the Districts.  *Id.* ¶¶ 8, 9 & 11.  The ideal number should be 664,180 or 664,181 residents in each District.  *Id.* ¶ 12.  The lines as presently drawn, therefore, result in a deviation of 0.652 percent from the ideal.[6]

Plaintiffs DeSena and Dunham filed this lawsuit on March 28, 2011 – only four days after the state received the 2010 census data – claiming that Maine's statutes are unconstitutional insofar as they do not call for Maine to reapportion

---

[5] This calculation to obtain this number is as follows:  the ideal in 2000 was 637,461.5 people in each district; the deviancy was 11.5 people  because the districts had 637,450 and 637,473, respectively;  11.5 divided by 637,461.5, gives us 0.001804 percent.

[6] This calculation to obtain this number is as follows:  the ideal in 2010 is 664,180.5 people in each district; the deviancy is 4334.5 people  because the districts had 668,515 and 659,846, respectively;  4334.5 divided by 664.180.5, gives us 0.652 percent.

Congressional districts prior to the first federal election following receipt of the federal decennial census data.

## SUMMARY OF ARGUMENT

Maine's apportionment scheme is not *per se* unconstitutional with respect to Congressional districts.   It is unconstitutional as applied, however, under circumstances in which federal decennial census data shows a population variance between existing districts that could be narrowed to more closely achieve the standard of equality established by the Supreme Court. The 2010 census data reveals such a disparity.  Accordingly, the state is constitutionally required to make a good faith effort to achieve that standard, by undertaking an apportionment process before the next Congressional election.

## ARGUMENT

 The questions presented by the Court are so closely linked that it may be more efficient to discuss them together.  They encompass both the timing and substantive standards for apportionment of Congressional districts.

### Standard for Congressional Apportionment.

The Supreme Court has established a high standard for apportionment of Congressional districts, noting the federal Constitution's "plain objective of making equal representation for equal numbers of people the fundamental goal of the House of Representatives." *Wesberry v. Sanders,* 376 U.S. 1, 18 (1964). "[T]he

command of Art. I, § 2, ... means that as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's." *Id.* at 7-8. Article I, § 2 "require[s] that absolute population equality be the paramount objective of apportionment only in the case of congressional districts...." *Karcher v. Daggett,* 462 U.S. 725, 733 (1983). In pursuit of that goal, the Supreme Court has explained that Article I, § 2 "permits only the limited population variances which are unavoidable despite a good-faith effort to achieve absolute equality, or for which justification is shown." *Kirkpatrick v. Preisler,* 394 U.S. 526, 531 (1969). Accord, *White v. Weiser,* 412 U.S. 783, 790 (1973). "[T]he 'as nearly as practicable' standard requires that the State make a good-faith effort to achieve precise mathematical equality. Unless population variances among congressional districts are shown to have resulted despite such effort, the State must justify each variance, no matter how small." *Kirkpatrick,* 394 U.S. at 530-31 (citation omitted).

The Supreme Court has made clear in Congressional redistricting "that there are no *de minimis* population variations, which could practicably be avoided...without justification." *Karcher,* 462 U.S. at 734.[7] *Karcher,* 462 U.S. at

---

[7] The courts have utilized a 10 percent safe harbor for state legislative redistricting, but have made clear that this does not apply to Congressional redistricting, and that states have a constitutional obligation to draw congressional districts with equal numbers of constituents, or else justify any differences, no matter how small, with a legitimate reason. *Karcher,* 462 U.S. at 734; *see also, Brown v. Thompson*, 462 U.S. 835, 850 n.2 (2003) (O'Connor, J., concurring) ("The Court has recognized

732; *Kirkpatrick,* 394 U.S. at 530-31.   For example, the Court has rejected *de minimis* deviations smaller than the "inevitable statistical imprecision of the census." *Id.* at 735.  The Supreme Court has also disapproved of variances as small as 0.19 percent from ideal, *Kirkpatrick,* 394 U.S. at 529 n.1, and where the difference in population between the largest and smallest Congressional districts in a state was 3,674 people, *Karcher,* 462 U.S. at 728.

The justifications for a deviation must support a legitimate, consistent public policy and must be factually based.  "[A] State [can] justify small variations in the census-based population of its congressional districts on the basis of some legitimate, consistently applied policy...." *Karcher,* 462 U.S. at 741. "Any number of consistently applied legislative policies might justify some variance, including, for instance, making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent Representatives....[a]s long as the criteria are nondiscriminatory...." *Id.* at 740. States must be careful, as the courts have rejected "the argument that variances are justified if they necessarily result from a State's attempt to avoid fragmenting political subdivisions by drawing congressional district lines along existing county,

that States enjoy a somewhat greater degree of latitude as to population disparities in a state legislative apportionment scheme, which is tested under Equal Protection Clause standards, than in a congressional redistricting scheme, for which the Court has held that Art. I, § 2 of the Constitution provides the governing standard.")

municipal, or other political subdivision boundaries." *Kirkpatrick,* 394 U.S. at 533-34.

### Timing of Congressional apportionment.

The federal Constitution does not expressly provide a time frame within which states must redefine their Congressional districts after the number of Representatives for that state has been determined.[8]  The obligation to redefine the boundaries between Congressional districts derives solely from the constitutional requirement that Congressional districts be "apportioned to achieve population equality 'as nearly as is practicable.'"

The claim presented by plaintiffs in this lawsuit – that it is unconstitutional for a state to delay redistricting until after the first Congressional election following receipt of decennial census data – has never been squarely presented to the United States Supreme Court as a contested issue.  In the context of reviewing the constitutionality of states' reapportionment plans, however, the Supreme Court has suggested that the state has an obligation to act promptly *if* disparities revealed in the census data indicate that existing districts fail to meet the constitutional standard of achieving "population equality 'as nearly as is practicable.'"

---

[8] According to a recent survey, the majority of state constitutions are also silent with respect to the timing of congressional redistricting.  *See* Justin Levitt & Michael McDonald, *Taking the 'Re' out of Redistricting:  State Constitutional Provisions on Redistricting Timing*, 95 Georgetown Law Journal 1247, 1258-59 (2007).

Thus, in *Georgia v. Ashcroft*, 539 U.S. 461, 489 n.2 (2003) (involving review of a state apportionment plan for legislative districts), the Court declared in a footnote:

> When the decennial census numbers are released, States must redistrict *to account for any changes or shifts in population*. But before the new census, States operate under the legal fiction that even 10 years later, the plans are constitutionally apportioned. After the new enumeration, no districting plan is likely to be legally enforceable if challenged, given the shifts and changes in a population over 10 years. *And if the State has not redistricted in response to the new census figures, a federal court will ensure that the districts comply with the one-person, one-vote mandate before the next election.*

539 U.S. at 489 n.2 (2003) (emphasis added).

In *Growe v. Emison,* the court noted "the reality that States must often redistrict in the most exigent circumstances - during the brief interval between completion of the decennial federal census and the primary season for the general elections in the next even-numbered year."  507 U.S. 25, 35 (1993).  The timing issue was not one the *Growe* court had to decide, however, since the parties had already stipulated that Minnesota's existing districts were unconstitutional based on population disparities shown in the new census data.  *Id.* at 27-28.  The Colorado Supreme Court reached the same conclusion with respect to the timing of reapportionment.  *See Salazar* v. *Davidson,* 79 P.2d 1221, 1231 (Colo. 2003)

("Each state must draw congressional districts immediately after each federal census and before the ensuing general election.").

The courts appear to afford some additional leeway to states when reapportioning their own legislative districts in the face of Equal Protection challenges, rather than Article 1, Section 2 claims.  The courts

> do not regard the Equal Protection Clause as requiring daily, monthly, annual or biennial reapportionment, so long as a State has a *reasonably conceived plan* for periodic readjustment of legislative representation. While we do not intend to indicate that decennial reapportionment is a constitutional requisite, compliance with such an approach would clearly meet the minimal requirements for maintaining a reasonably current scheme of legislative representation.... But if reapportionment were accomplished with less frequency, it would assuredly be constitutionally suspect.

*Reynolds v. Sims,* 377 U.S. 533, 583-84 (1964) (emphasis added).  For example, in *Bacon v. Carlin,* 575 F.Supp. 763 (D. Kan. 1983) (three-judge court), *aff'd* 466 U.S. 966 (1984), the panel dealt with reapportioning state legislative districts.  In *Bacon,* the court had before it a situation where the State was transitioning from its own census to the federal one.  575 F.Supp. at 764.  Kansas had reapportioned its legislative districts in 1979 based on the state census, which was not challenged as violating the Equal Protection clause.  Thereafter, Kansas was to use the federal decennial census data.   When the 1980 federal decennial census was certified, Kansas did not reapportion its legislative districts and did not plan to do so again until 1989.  A suit claiming a violation of Equal Protection was filed.  The court

14

rejected the challenge largely because the data for the 1979 redistricting was not over 10 years old, and declined to address the constitutionality of what might happen in 1989.  *Id.* at 766-67.  The court, however, cautioned that "in 1989, if the Kansas legislature attempts to implement its constitutional provision requiring reapportionment by reliance upon 1980 federal census figures or those figures updated by estimates, constitutional problems will arise."  *Id.* at 766.

In *Bacon*, a question was then certified to the Supreme Court: "[W]hether a state legislature which validly reapportioned its legislative districts gains a ten-year 'safe harbor' protecting it from further reapportionment no matter what factual or statutory changes occur?"  *Black Political Task Force v. Connolly,* 1992 WL 605665, at *1 (D.Mass. February 10, 1992) (three-judge court) (discussing *Bacon*). "The Court's summary affirmance indicates that the answer to this query is 'yes.'" *Id.*, citing *Bacon v. Carlin,* 466 U.S. 966 (1984).

In *Black Political Task Force v. Connolly, supra,* a three-judge court in this circuit upheld against an Equal Protection claim a delay in reapportioning state legislative districts based upon the 1990 federal census until after the 1992 elections because the state was transitioning from use of the state census to the federal census.  The state law contemplated, on its face, that in the future this delay would continue following each federal decennial census.  The court declined to answer the question whether the United States Constitution permits Massachusetts

15

"to delay, on a permanent basis, redistricting for four years, until the second election following each federal census?" *Id.* at *2.  In *dicta,* however, the court presciently commented: "By [2000], of course, any pains of birth or transition from redistricting on the basis of state census data to the federal census will have passed. Moreover, computer programs will long have been devised and put into effect. We cannot at the moment conceive of any set of circumstances that would support a judicial finding, *circa* 2000, that a plan which continues to delay use of census figures for a four-year period is 'reasonably conceived.'" *Id.* at *2.

These cases appear to be outliers, founded upon the peculiarities presented by the "transition" periods.  Other cases, moreover, suggest that the federal decennial census could spur reapportioning prior to the next election even for state legislative districts depending upon the magnitude of population shifts.  *See e.g., Farnum v. Burns*, 548 F.Supp. 769 (D.C.R.I. 1982) ("opinions of the Supreme Court indicate that a state can constitutionally be compelled to reapportion in time for the first election after a census, even where the existing reapportionment scheme is less than ten years old") (three-judge court).

### The Present Case.

*Per se* challenges are generally disfavored in view of the speculation regarding the broad spectrum of conceivable factual situations that may be presented.  *Washington State Grange v. Washington State,* 552 U.S. 442, 450

(2008) (disfavoring facial challenges).  "[A] plaintiff can only succeed in a facial challenge by 'establish[ing] that no set of circumstances exists under which the Act would be valid,' *i.e.,* that the law is unconstitutional in all of its applications." *Id.* at 449 (*quoting United States v. Salerno,* 481 U.S. 739, 745 (1987)).  Here, the Maine statutory scheme is not *per se* unconstitutional because it is *conceivable* that the disparity between the two Congressional districts could remain as small as previously apportioned and approved by the courts.  In other words, because it is conceivable that the difference in population shown on two successive federal censuses is equal or less in the second as compared to the first, the delay in the statute is not *per se* unconstitutional.

The 2010 census, however, shows that the variance from the ideal in Maine of 0.652 percent is greater than that disapproved by the Supreme Court in *Kirkpatrick,* 394 U.S. at 529 n.1 (0.19 percent), and the difference in population between the two Maine districts of 8,669 people is greater than that also disapproved by the Court in *Karcher,* 462 U.S. at 728 (3,674 people).  Because of its statutory provision setting the time for reapportionment after the next federal election in 2012, under the present scheme Maine will not go through a process where it might attempt to justify a population variance between the two Congressional districts prior to that election.  The difference in population between Maine's Congressional districts as of the 2010 census is the result of population

17

shift, *not a consistently applied legislative policy.   Karcher,* 462 U.S. at 741.

There exists no legitimate justification for the population difference because, quite

simply, the Legislature has gone through no process where one might be identified.

Thus, *as applied* to the present situation, the timing provision in Maine's statute is

unconstitutional.

Even if the courts' standards for review of state legislative redistricting were

applicable, it is hard to accept that Maine's delay until after the 2012 election is

"reasonably conceived" when there is no period necessary to transition from one

set of data to another and the task at hand involves the redrawing of only one line

between two districts rather than a multitude of state legislative district lines.

More importantly, the analysis from *Bacon* and *Black Political Task Force* is

founded on the Equal Protection clause, and not Article I, § 2.  As previously

noted, there is  "a somewhat greater degree of latitude as to population disparities

in a state legislative apportionment scheme ... than in a congressional redistricting

scheme" because the former is resolved under the Equal Protection Clause

standards while the latter is governed by Art. I, § 2 of the Constitution.   *Brown v.*

*Thompson*, 462 U.S. 835, 850 n.2 (2003) (O'Connor, J., concurring).   The

applicable law and common sense dictate that for Maine to delay reapportioning its

two Congressional districts under the present statutory scheme would run afoul of

18

Article I, § 2, due to the difference in population confirmed in the 2010 census.[9]

## CONCLUSION

For the reasons discussed above, this Court should conclude that given the differences in population between the two districts, which are shown by the 2010 census to be 0.652 percent from the ideal, Maine must engage in a good faith effort to reapportion those districts to achieve equality before the next Congressional election.

DATED:  May 20, 2011     Respectfully submitted,
             WILLIAM J. SCHNEIDER
             Attorney General

             /s/ Paul Stern
             PAUL STERN
             Deputy Attorney General
             paul.d.stern@maine.gov
             PHYLLIS GARDINER
             Assistant Attorney General
             phyllis.gardiner@maine.gov
             State House Station
             Augusta, Maine  04333-0006
             Tel.  (207) 626-8568
             Fax (207) 287-3145

             Attorneys for Defendants

---

[9] A final comment should be made about the nonseverability clause in 21-A M.R.S. §1207(3).  Presently, there is no challenge to the timeframes in section 1206 regarding the State legislative districts.  It is unnecessary at this juncture to address this issue for the reasons expressed in *Bacon,* 575 F.Supp. at 766, and *Black Political Task Force,* 1992 WL 605665, at *2, which allowed other and future redistricting issues to play out on their own before court involvement.

## CERTIFICATE OF SERVICE

I hereby certify that on this, the 20th of May, 2011, I electronically filed the

above document with the Clerk of Court using the CM/ECF system, which will

send a copy of such to the following registered participants:


Timothy C. Woodcock, Esq.
EATON PEABODY
80 Exchange Street
P.O. Box 1210
Bangor, ME 04402-1210
(207) 947-0111
 twoodcock@eatonpeabody.com

Janet T. Mills, Esq.
Preti Flaherty Beliveau & Pachios, LLP
45 Memorial Circle
P.O. Box 1058
Augusta, ME 04332-1058
Tel.: 207-623-5300
jmills@preti.com


                                    /s/ Paul Stern
                                   PAUL STERN
                                   Deputy Attorney General
                                   Six State House Station
                                   Augusta, Maine  04333-0006
                                   Tel.  (207) 626-8568
                                   Fax (207) 287-3145
                                   paul.d.stern@maine.gov