UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| WILLIAM DESENA and SANDRA W. DUNHAM, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Docket No. 1:11-cv-117-GZS-DBH-BMS ) |
| STATE OF MAINE, et al., | ) ) |
| Defendants. | ) |

**PLAINTIFFS' OPENING BRIEF**

William DeSena and Sandra W. Dunham, by and through their undersigned counsel, hereby submit this brief pursuant to the Court's Scheduling Order of April 28, 2011, addressing the two legal questions set forth in the Order.

## I.    INTRODUCTION

At issue is Plaintiffs' Complaint alleging that recent data from the U.S. Census Bureau documents a significant disparity between the populations of the First and Second Congressional Districts for the State of Maine, which, if unremedied, would dilute Plaintiffs' votes in violation of Article I, Section 2 of the United States Constitution and the Equal Protection Clause of the Fourteenth Amendment. Compl. ¶¶ 1, 2, 26 and 27.

The apportionment process for the two congressional districts, as set forth in Maine law, provides that, notwithstanding the demonstrated population disparity, the state legislature is not required to reapportion the districts until some time in 2013. Id. at 4. In the meantime, the elections for the congressional seats for the two districts, which will be held in 2012, will occur. Statutory nominating requirements begin at the first of the year in 2012. As is stated in the Joint Stipulation of Facts filed by all parties hereto, candidates for the United States House of Representatives who wish to be nominated by a major party may begin collecting signatures on

1

primary nomination petitions on January 1, 2012. Me. Rev. Stat. tit. 21-A, §335(6). To qualify for the primary ballot, each candidate must collect signatures from "at least 1,000 and not more than 1,500 voters" of the electoral district. Me. Rev. Stat. tit. 21, §335(2). Primary petitions must be filed with the Secretary of State no later than March 15, 2012. Me. Rev. Stat. tit. 21-A, §335(8). The primary election is to be held on the second Tuesday of June of 2012. Me. Rev. Stat. tit. 21-A, §339.[1]

Permitting the 2012 congressional elections to go forward without reapportioning the congressional districts to eliminate the population disparity revealed by the Census dilutes Plaintiffs' votes and deprives them of their right to vote under the U.S. Constitution. Id. at ¶¶ 4, 21-24. Plaintiffs have asked this Court to declare that the boundaries of the First and Second Congressional Districts, as currently drawn, violate the Plaintiffs' voting rights and, further, that this Court redraw the boundaries of the two districts in conformity with constitutional requirements. Id. at Prayer for Relief, ¶¶ c, e.

The State Defendants answered Plaintiffs' Complaint acknowledging the existence of a population disparity and the timing of reapportionment as provided by Maine law, but largely denied Plaintiffs' allegations regarding the legal import of those conditions. State Defs.' Answer, passim. The Maine Democratic Party was granted Intervenor status and filed an Answer which was similar to the answer of the State Defendants. Answer of Maine Democratic Party, passim.

## II.   BACKGROUND

It appears that, for many years, Maine apportioned its congressional district in time for the election cycle immediately following the issuance of updated Census information. See, e.g.,

---

[1] In addition, Maine residents seeking to serve as delegates to presidential nomination conventions are elected based on their residency in one or the other of Maine's congressional districts. Me. Rev. Stat. tit. 21-A, §352. As such, the current malapportionment of those districts also impacts the process for the upcoming presidential election.

Opinion of the Justices, 33 Me. 587 (1851) (noting the year 1821 as the reference point for the 10 year reapportionment cycle); Opinion of the Justices, 148 Me. 404, 405, 94 A.2d 816 (1953) (noting that reapportionment had occurred in 1941).

In 1981, the Maine State Legislature enacted into law L.D. 1331, which provided, *inter alia*, that congressional redistricting would be tied to the timing of the reapportioning of the Maine State Legislature. Exhibit A, L.D. 1331, "An Act to Require Periodic Reapportioning of the Districts for Election of Representatives to Congress." The 1981 law subsequently was superseded by the current law, 21-A M.R.S.A. §1206, which tied the timing of the reapportionment of the congressional districts to the timing of the reapportionment of the Legislature's House and Senate Districts; the latter of which is determined by an amendment to the Maine Constitution. Me. Const., art. IV, Part Third, § 1-A.

The Legislative history of L.D. 1331 is sparse and cryptic. A colloquy in the House of Representatives suggests that it was tied to the timing of the reapportionment of the legislature itself. The colloquy refers to "three court cases" regarding State reapportionment. Exhibit B, Legislative Record, Maine House, May 21, 1981, 1290-1291; see also In re 1983 Legislative Apportionment of the House, Senate and Congressional Districts, 469 A.2d 819 (Me. 1983) (Judicial notice may be taken of the Law Court's decision approximately two years later ruling on certain reapportionment questions).

There is no indication in this limited legislative history that the Maine State Legislature considered the propriety and lawfulness of effectively skipping an election cycle for these congressional offices, notwithstanding the issuance of current Census data. There is no indication that the Legislature considered the requirements of Article I, Section 2 of the U.S. Constitution or the decisions of the U.S. Supreme Court interpreting and applying that section.

3

Exhibits A and B, passim.

### III.     ISSUES PRESENTED

By Order dated April 28, 2011, this Court divided the issues presented by Plaintiffs' Complaint into "liability" and "remedy" phases. For the Liability Phase, this Court set forth two questions to be answered in this brief as follows:

"First, Is Maine's apportionment scheme, as laid out in the Maine Constitution and relevant state statutes, unconstitutional per se with respect to Congressional districts?"

"Second, having received the relevant 2010 Census data, is it unconstitutional for Maine not to engage in redistricting of its Congressional districts prior to the 2012 election cycle?"

Plaintiffs now respond to these questions.

### ARGUMENT

The State of Maine and the other defendants named herein ("Defendants") have a constitutional obligation to redistrict Maine's two congressional districts in light of new data from the 2010 census that shows an unconstitutional disparity in population between the two districts. Maine state law specifically provides for congressional redistricting to occur every third year of the decade, and not before. Therefore, this redistricting is not scheduled to take place until 2013. Maine is scheduled to hold primary and general elections in 2012, for which candidates must submit a primary petition no later than March 15, 2012, which petitions are available starting January 1, 2012. The primary elections are to be on the second Tuesday of June 2012. Maine state law effectively requires the State to hold a congressional election using malapportioned districts. This scheme is *per se* unconstitutional under Article I, section 2 of the U.S. Constitution, and the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution.

The current 8,669 population variance between Maine's congressional districts also is unconstitutional *per se*. The 8,669-person variance does not meet the "one person, one vote" requirement of Article I, section 2 of the U.S. Constitution as set forth by the United States Supreme Court. Wesberry v. Sanders, 376 U.S. 1, 18 (1969). The Supreme Court will not uphold population deviations among districts, "no matter how small," if they are not the result of good-faith effort to achieve population equality. Kirkpatrick, 394 U.S. Defendants cannot seriously contend that the current 8,669 resident variance complies is as close to equal as practicable as required by the U.S. Constitution. Wesberry, 376 U.S. at 7-8. Thus, the Maine legislature is required to put forth a good-faith effort to redraw the district lines.

Where a decennial census makes it apparent that a state's redistricting plan is unconstitutional and no longer enforceable, a state must engage in redistricting or a federal court "will ensure that the districts comply with the one-person, one-vote mandate before the next election." Georgia v. Ashcroft, 539 U.S. 461, 488 n.2 (2003) (citing Branch v. Smith, 538 U.S. 254 (2003), Lawyer v. Dep't of Justice, 521 U.S. 567 (1997), and Growe v. Emison, 507 U.S. 25 (1993)). Accordingly, in order to avoid running afoul of the United States Constitution, Defendants must redistrict prior to Maine's statutory requirement of 2013.

### A. FIRST QUESTION

**Maine's Scheme for Apportioning its Congressional Districts is *Per Se* Unconstitutional**

Maine's apportionment scheme, which does not prescribe redistricting until the third year of each decade, is *per se* unconstitutional. No other state apportioning more than a single congressional member fails to redistrict before the next congressional election. Maine's waiting period, coupled with the intervening congressional election every second year of the decade, guarantees that at least one congressional election of every decade will be held using old,

malapportioned districts.  This is *per se* unconstitutional under Article I, section 2 of the U.S. Constitution, and the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution.

Pursuant to Maine state law, "congressional districts must be reapportioned . . .[i]n 1993 and every 10 years thereafter."  Me. Stat. Ann. Tit. 21-A, Chap. 15, § 1206.  The reapportionment is undertaken by "the Legislative Apportionment Commission, [which is] established every 10 years" by the Maine state legislature.  Id.; Me. Const. Art. IV, Part Third, § 1-A.  The particular state legislature that engages in the reapportionment process is, and must be, the legislature that convenes in the third year of each decade—in this case, in 2013.  Under the Maine Constitution, the "Legislature which convenes in 1983 and every 10th year thereafter . . . shall" engage in redistricting.  Me. Const., Art. IV, Part First, § 2 (emphasis added) (requiring apportionment of state representative districts); Me. Const., Art. IV, Part Second, § 2 (requiring apportionment of state senate districts); Me. Const. Art. IV, Part Third, § 1-A (predicating the formation of the Legislature Apportionment Commission on the reapportionment directives in Art. IV, Part First, § 2 and Art. IV, Part Second, § 2 of the Constitution); Me. Stat. Ann. Tit. 21-A, Chap. 15, § 1206 (requiring use of the Legislature Apportionment Commission, which is established only every third year of the decade, to apportion congressional districts).

The result of all of these provisions of the Maine Constitution and Maine statutory law is that Maine state law specifically provides for congressional redistricting to occur every third year of the decade, and not before.  With a congressional election being held every second year of the decade, and no new map in the interim following release of census data, Maine state law effectively requires the State to hold a congressional election using malapportioned districts.

As is noted above, Maine is unique in this way.  It is the only state in the United States to

6

wait three years before engaging in redistricting. Every other state engages in redistricting relatively immediately following the release of final census data—data that could alter the number of congressional districts in a given state and, at the very least, would alter the ideal, equal population of congressional districts. NATIONAL CONFERENCE OF STATE LEGISLATURES, REDISTRICTING LAW 2010 (2009). Courts have recognized that it is necessary to go through the redistricting process after each census, and there is no legitimate, much less a compelling, state interest to wait before constructing properly apportioned districts. Yet, Maine state law requires the State to wait and, in the interim, the State will hold a congressional election that violates the constitutional rights of the citizens of Maine whose votes are diluted due to malapportionment. This apportionment scheme is *per se* unconstitutional under the United States Constitution, and should be struck down in its entirety.

Moreover, Maine's reapportionment scheme is inconsistent with federal reapportionment law. The federal Reapportionment Act of 1929, 46 Stat. 21-27 (1929), codified at 2 U.S.C. § 29 ("Act"), made the reapportionment process self-executing, eliminating the need for Congress to enact an apportionment act after each decennial census. This Act was passed following a decade in which no congressional apportionment/redistricting was implemented, in any state, following the 1920 census. The number of members in each state (from 1920 through 1930) was the same as they had been apportioned following the 1910 census.

The major purpose of this Act and of other reapportionment acts passed by Congress was to make apportionment an automatic event so that regional or partisan politics could not frustrate the constitutional imperative to adjust the number of members "according to their respective numbers." U.S. Const. art. I, § 2. Indeed, the legislative history to the Reapportionment Act of 1941, Pub. L. No. 77-291, § 22, 55 Stat. 761-769 (Nov. 15, 1941),which sets forth the method

for reapportionment, states:

> [R]egardless of the method adopted, there should be automatic reapportionment fixed and definitely established by law before the figures for each decennial census are announced. This principle has long been agreed to by students of the problem. It is obvious that it is better to lay down the general principle which is to be followed when there is no dispute between States or Congressmen; in other words, when the personal and political elements are not factors.

*Reapportionment of the House of Representatives by the Method of Equal Proportions*, 77th Cong. (July 23, 1941) (statement of Rep. Brown, member, H. Comm. on Commerce).

During the Supreme Court's Reapportionment Revolution, the clear constitutional goal of the apportionment process was defined, starting with Karcher v. Daggett, 462 U.S. 725 (1983), and Wesberry v. Sanders, 376 U.S. 1 (1964). The Court stated that "the command of Art. I, § 2, that Representatives be chosen 'by the People of the several States' means that as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's." Wesberry, 376 U.S. at 7-8.

The results of the 2010 federal census have provided the most current information upon which the districts in Maine can now be adjusted to implement this constitutional mandate. Maine's current congressional districts are not as practicably equal in population as possible for the purposes of congressional elections. Allowing the state of Maine to redistrict at a later time, rather than for the election immediately following the release of the census data and the receipt of the certificate from the Clerk of the U.S. House of Representatives, frustrates the very purpose of the Act. Undertaking redistricting at any other time would make the event a discretionary one subject to the will of the state officials in whom this important responsibility has been placed by the citizens of Maine.

The timing issue is not merely one of a ten-year time span. The key concept is that the redistricting should be initially accomplished when the census counts are the most current in

order to create districts that are "as nearly as is practicable" equal in population, as is mandated by Article I, Section 2 of the United States Constitution. Wesberry, 376 U.S. at 7-8.

## B. SECOND QUESTION

**It Is Unconstitutional for Maine Not To Engage in Redistricting Prior to the 2012 Election Cycle**

It is unconstitutional in this case for the Defendants not to engage in redistricting prior to the 2012 election cycle. Following the 2010 Census, it is clear that Maine's current Congressional Districts are unconstitutional and, irrespective of the timeline set by Maine law, Defendants must act to redraw the Congressional Districts in advance of the 2012 election cycle in order to not deprive Maine voters of their right to an equal, fair, and effective opportunity to cast a meaningful ballot for the Maine delegation to the United States House of Representatives.

### 1. *Maine's Congressional Districts Are Not Equally Populated and Dilute Plaintiffs' Votes in Violation of the United States Constitution*

The United States Constitution requires that each congressional district in a state contain equal population. See Wesberry v. Sanders, 376 U.S. 1, 18 (1964). Article I, section 2 of the Constitution requires that "as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's." Wesberry, 376 U.S. at 18. The Supreme Court has been exceedingly clear in requiring lower courts to balance population among congressional districts with precision. See Karcher v. Daggett, 462 U.S. 725, 734 (1983) ("there are no *de minimis* population variations, which could practically be avoided, but which nonetheless meet the standard of Art. I, § 2 without justification.") The "as nearly as practicable" standard articulated in Wesberry "requires that the State make a good-faith effort to achieve precise mathematical equality." Kirkpatrick v. Preisler, 394 U.S. 526, 531 (1969) ("[T]he State must justify each variance, no matter how small."). In a challenge to a congressional redistricting plan, the

plaintiff bears the burden of proving that the differences in district-to-district population could have been reduced or eliminated altogether by a "good-faith effort to draw districts of equal population." Karcher, 462 U.S. at 730.

The Equal Protection Clause of the 14th Amendment was also held by the U.S. Supreme Court to require voting districts to be apportioned on a population basis. Reynolds v. Sims, 377 U.S. 533 (1964) ("the overriding objective must be substantial equality of population among the various districts." Id. at 579; see also Baker v. Carr, 369 U.S. 186 (1962) (interpreting the Equal Protection Clause of the 14th Amendment to the U.S. Constitution to require that electoral districts be periodically adjusted or redrawn to account for population shifts among them). Therefore, a congressional districting plan that fails to apportion on a population basis deprives voters of Equal Protection of the laws.

According to these requirements, Maine's current congressional districts are unconstitutional *per se*. The population variance among the current Maine congressional districts does not meet the "one person, one vote" requirement of Article I, section 2 of the United States Constitution as set forth in Wesberry. 376 U.S. at 18. In 2000, the State of Maine had a total population of 1,274,923. Joint Stipulation of Facts ¶ 1. The Federal Bureau of the Census reports that, as of the year 2010, Maine's population has grown to approximately 1,328,361 residents, with 668,515 persons in Congressional District 1 and 659,846 persons in Congressional District 2. Id. at 7-9. The population of the two districts thus varies by 8,669 residents, and Congressional District 1 is overpopulated. Id. at ¶ 11. The overall range of deviation from the ideal population of the congressional districts is 1.3%. As a result, Plaintiffs, who reside in Congressional District 1, are at risk of having their vote improperly diluted in future primary or general elections, including the elections to be held in 2012. This vote dilution

can be solved only by redrawing the current Congressional Districts to meet the United States Supreme Court's "express goal of getting as close as possible to zero deviation" between the districts. Vieth v. Pennsylvania, 195 F. Supp. 2d 672, 676 (2002) (citing Karcher, 462 U.S. at 734, 103 S. Ct. at 2660).

The Maine legislature must put forth a good-faith effort to redraw the district lines. The Supreme Court will not uphold population deviations among districts, "no matter how small," if they are not the result of good-faith effort to achieve population equality. Kirkpatrick, 394 U.S. at 531. The Court requires that "absolute population equality be the paramount objective of apportionment . . . adopting any standard other than population equality, using the best census data available . . . would subtly erode the Constitution's ideal of equal representation." Karcher, 462 U.S. at 731-32. Courts will strike down reapportionment plans with even minute deviations where the state does not put forth a good-faith effort to achieve population equality. See, e.g., Kirkpatrick, 394 U.S. at 530-532 (stating, "the command of Art. I s 2, that States create congressional districts which provide equal representation for equal numbers of people permits only the limited population variances which are unavoidable despite a good-faith effort to achieve absolute equality"); Veith v. Pennsylvania, 195 F. Supp. 2d 672, 677 (2002) (rejecting redistricting plan with a **19-person** variance because Defendants did not put forth a good-faith effort to draw "districts of equal population.").

Courts will pass a redistricting plan that does not achieve absolute population equality only where the population deviation is necessary to achieve a legitimate state objective. Kirkpatrick, 394 U.S. at 530. It is the state's burden to prove a legitimate state objective justifying the population deviation among congressional districts. While Karcher and Kirkpatrick did not specify how a state might meet its burden, they did give several examples of

11

legislative policies that might justify some variance among the populations of congressional districts, such as "making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent representatives." Karcher, 462 U.S. at 741. However, the Court was careful to specify that these reasons only justify minor population deviations among congressional districts. Id. The courts have also made clear that the burden borne by the state varies inversely with the magnitude of the population deviation. That is, "the greater the deviation, the more compelling the government's justification must be." Vieth, 195 F. Supp. 2d at 677.

In recent cases where courts have found that a state's objective justified a plan with a population variance greater than absolute equality, the population variances found acceptable by the courts are tiny in comparison to the 8,669-resident variance between Maine's two congressional districts. See Larios v. Cox, 300 F. Supp. 2d. 1320 (2004) (variance of 72 residents to preserve precinct lines), Graham v. Thornburgh, 207 F. Supp. 2d 1280 (2002) (variance of 32 residents caused least shift of population from the previous plan); Anne Arundel County Republican Cent. Comm. v. State Advisory Bd. Of Election Laws, 781 F. Supp. 394 (D. Md. 1991 variance of 10 people to keep major regions intact and create minority voting district). In the post-Karcher era of zero tolerance for congressional district population deviation there are no examples of congressional districting plans surviving a constitutional challenge with population deviations as large as 8,669.

The United States Supreme Court has expressly stated that the states are to engage in a good-faith effort to draw congressional district lines to achieve population equality between the various districts. The Defendants cannot seriously contend that Maine's congressional districts, as they currently stand, are as close to equal as practicable. Without at least making a good faith

effort to redraw the current districts, any arguments by Defendants on this point are a mere pretext.

### 2. *Defendants Must Engage in Redistricting Prior to 2013 In Order to Hold Constitutional Elections*

As is established above, Maine's current Congressional Districts are unconstitutional under Article I, section 2 of the United States Constitution, and under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. To hold an election in 2012 using the current malapportioned districts would violate Plaintiffs' constitutional rights. Farnum v. Burns, 548 F. Supp. 769, 774 (D.R.I. 1982) (The "use of the [old] lines in the [upcoming 2012] elections would be unconstitutional in light of the population shifts revealed by the [2010] federal census results.") Where a decennial census makes it apparent that a state's redistricting plan is unconstitutional and no longer enforceable, a state must engage in redistricting or a federal court "will ensure that the districts comply with the one-person, one-vote mandate before the next election." Georgia v. Ashcroft, 539 U.S. 461, 488 n.2 (2003) (citing Branch v. Smith, 538 U.S. 254 (2003), Lawyer v. Dep't of Justice, 521 U.S. 567 (1997), and Growe v. Emison, 507 U.S. 25 (1993)). Thus, in order to avoid running afoul of the United States Constitution, Defendants must redistrict prior to Maine's statutory requirement of 2013.

This outcome is compelled by the Supremacy Clause of the United States Constitution, U.S. Const. Art. V, and, not surprisingly, it is not unprecedented. A number of federal courts, including the United States Supreme Court, have required (or upheld requiring) states to engage in redistricting in advance of deadlines prescribed by state law when necessary to ensure that a constitutional plan is in place for an upcoming election. See, e.g., Sixty-Seventh Minn. State Senate v. Beens, 406 U.S. 187, 195 (1972) (deeming "appropriate" a federal district court's decision to redistrict when, "in light of the 1970 census figures," the Minnesota's 1966

apportionment legislation "no longer provided a constitutionally acceptable apportionment"); Farnum v. Burns, 548 F. Supp. 769, 773-775 (D.R.I. 1982) (requiring Rhode Island to redistrict its state senate districts following the 1980 census because it would be unconstitutional to use lines drawn in 1974); Flateau v. Anderson, 537 F. Supp. 257, 264-266 (S.D.N.Y. 1982) (noting the agreement of all of the parties that "a new apportionment plan must be enacted for the 1982 congressional election," and concluding that "the Equal Protection Clause of the Fourteenth Amendment, in conjunction with the Supremacy Clause of Article 6 of the United States Constitution, [also] mandates immediate reapportionment" of state legislature); Honsey v. Donovan, 236 F. Supp. 8, 18-21 (D. Minn. 1964) (requiring Minnesota legislature to reapportion state legislative districts during its 1965 legislative session in advance of elections to be held in 1966 because the then-current plan, enacted in 1959, violated the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution).

In each of the above-cited cases, the state either was not required by state law to engage in redistricting at the time of the lawsuit, or for some reason was not going to have a new plan in place in time for the next election cycle. Beens, 406 U.S. at 189-90 (impasse in 1971 and next regular session not until 1973, but elections to occur in interim, in 1972); Farnum, 548 F. Supp. at 771-72 (redistricting plan not to take effect until 1984 elections, but state senatorial elections to occur in 1982); Flateau, 537 F. Supp. at 261 (no plan enacted in 1982 regular session of legislature, and elections to be held later in 1982); Honsey, 236 F. Supp. at 15 (no plan enacted in legislative sessions of 1961 or 1963, and elections to occur in 1966, following legislative session in 1965). In all instances, the state either was required to undertake redistricting to replace existing, unconstitutional plans prior to the next election, or, in the case of Farnum, was enjoined from holding an election that would use the unconstitutional plan at issue. Beens, 406

14

U.S. at 200-01 (vacating district court's order because "changing the number of legislative districts" was too broad a remedy, but remanding to the district court with instructions to "act promptly and forthwith so that the State's 1972 electoral process may get under way with assurance as soon as possible."); Farnum, 548 F. Supp. at 775 (enjoining state senatorial elections "until such time as a constitutionally permissible apportionment plan is devised"); Flateau, 537 F. Supp. at 266 (requiring the New York state legislature to adopt a constitutional redistricting plan by a date certain); Honsey, 236 F. Supp. at 21 (stating that the Minnesota state legislature "will enact appropriate reapportionment legislation effective forthwith, that is, for the 1966 and subsequent elections.").

The Supremacy Clause of the United States Constitution requires that Maine's congressional districts comport with the exacting population equality requirements of Article I, section 2, and the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. As currently drawn, Maine's congressional districts violate these provisions of the Constitution. See Part B.1., supra. Accordingly, irrespective of Maine state law requiring that redistricting take place in the year 2013, the Defendants can be required to—and must—engage in redistricting prior to the 2012 election cycle. To wait until 2013 and hold elections in 2012 using the current congressional districts would be patently unconstitutional.

## CONCLUSION

Based on the foregoing, Plaintiffs respectfully request this court to assume jurisdiction over this matter, enjoin Defendants from using the congressional districts as currently drawn in any future primary or general elections, and set a date certain by when Defendants must produce to the court a constitutional plan for Maine's congressional districts.

15

DATED this 20th day of May, 2011.

                      PLAINTIFFS WILLIAM DESENA AND
                      SANDRA W. DUNHAM

                      */s/ Timothy C. Woodcock, Esq.*
                      Timothy C. Woodcock, Esq.
                      EATON PEABODY
                      80 Exchange Street
                      P.O. Box 1210
                      Bangor, ME 04402-1210
                      (207) 947-0111
                      twoodcock@eatonpeabody.com

                      Attorneys for Plaintiffs

## **CERTIFICATE OF SERVICE**

I hereby certify that on this, the 20th day of May, 2011, I electronically filed the above document with the Clerk of Court using the CM/ECF system, which will send a copy of such to the following registered participants:

Paul Stern
Deputy Attorney General
Six State House Station
Augusta, Maine 04333-0006
Tel. (207) 626-8568
paul.d.stern@maine.gov

Janet T. Mills, Esq.
Preti Flaherty Beliveau & Pachios, LLP
45 Memorial Circle
P.O. Box 1058
Augusta, ME 04332-1058
Tel. (207) 623-5300
jmills@preti.com

                      */s/ Timothy C. Woodcock, Esq.*
                      Timothy C. Woodcock, Esq.
                      EATON PEABODY
                      Attorneys for Plaintiffs