UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| WILLIAM DESENA and SANDRA W. DUNHAM, <br><br> Plaintiffs <br><br> v. <br><br> STATE OF MAINE, et al., <br><br> Defendants | ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Docket No.  1:11-cv-117-GZS-DBH-BMS |

### PLAINTIFFS' REPLY BRIEF

William DeSena and Sandra W. Dunham, by and through their undersigned counsel, hereby submit this brief pursuant to the Court's Scheduling Order of April 28, 2011.

### I.      POSTURE OF THE PARTIES

The initial briefs filed by the parties revealed substantial agreement between the Plaintiffs and the State Defendants on the main issue presented—whether Maine's delayed implementation of the reapportionment of Maine's two congressional districts was unconstitutional under Article I, Section 2 of the United States Constitution and the Fourteenth Amendment thereto.

Plaintiffs argued that the delayed apportionment scheme set forth in the Maine Constitution and relevant statues was unconstitutional "per se."  The State Defendants have argued that the delayed apportionment scheme is not unconstitutional per se; but that it is unconstitutional "as applied."  If the Plaintiffs and the State Defendants were the only parties to this case, their disagreement on this fine point might be safely relegated to the realm of immateriality.  The Maine Democratic Party ("Democratic Party" or "Intervening Party"), as Intervenor, however, has argued that Maine's delayed congressional redistricting scheme complies with the U.S. Constitution in all particulars and should be upheld.  In light of the

Democratic Party's position, Plaintiffs must further address the constitutionality *vel non* of the timing of apportionment in the Maine scheme.

## II.     ARGUMENT

### A. MAINE'S CONGRESSIONAL REDISTRICTING SCHEME IS UNCONSTITUTIONAL PER SE AND AS APPLIED

To begin with, it bears emphasis that Plaintiffs' complaint does not seek to invalidate Maine's statutory scheme.  (Compl. for Declaratory and Injunctive Relief ¶¶ 1-5, 18-27, Prayer for Relief ¶¶ a–g.)  Plaintiffs merely seek to enjoin Defendants from using the congressional districts, as currently configured, in any future primary or general election(s), including but not limited to the elections scheduled to take place in the year 2012, so that Defendants will undertake to redraw constitutional congressional districts based on data from the 2010 decennial census.

The State Defendants have argued that Maine's whole congressional redistricting scheme, including the mandated delay in apportionment is not unconstitutional per se. *State Defendants' Brief* 16-17.  To sustain this position, the State Defendants assert that, "...the Maine [congressional redistricting] statutory scheme is not *per se* unconstitutional because it is *conceivable* that the disparity between the two Congressional districts **could** remain as small as previously apportioned and approved by the courts." *Id.* 17. (Italics in original, bold supplied). Expanding on this thought, the State Defendants explain, "[i]n other words, because it is **conceivable** that the difference in population shown on two successive federal censuses is equal to or less in the second as compared to the first, the delay in the statute is not per se unconstitutional." *Id.* 17.  (bold supplied).  To support their position, the State Defendants cite

the Supreme Court decision in Washington State Grange v. Washington State Republican Party, 552 U.S. 442, 450 (2008).

In Washington State Grange, the Supreme Court reviewed the standards by which a challenge to the facial validity of a statute should be judged  Of greatest concern were situations where the court was asked to invalidate a statute before it was actually applied. *Id.* at 449-450. The court also noted that considerations of judicial restraint and respect for the integrity of the interrelationship between representative government and legislative enactments also counseled caution. *Id.* at 450-451.

The State Defendants' position that Maine's delayed congressional reapportionment scheme is at least facially valid is based on a possibility that is so purely theoretical that it more resembles metaphysics than the law.  It should be rejected because there is no evidence in any 10 year cycle that the populations of the congressional districts of any state, much less those of Maine, have remained in such precise equipoise that no changes at all were required.

It should be noted that Intervening Party does not rely on this rationale.  To the contrary, the Democratic Party acknowledges that the emergence of population disparities between the two districts in each census is "inevitable." *Intervenor Brief* at 9, 12.  Instead, the Democratic Party appears to justify tolerating Census-demonstrated disparities in the next impending election on the grounds that such population changes are "passive." *Id.* at 11.[1]

No party suggests that there has been any point in Maine's history where the decennial Census has not revealed some population changes among the congressional districts.  The very nature of the reapportionment scheme at issue presupposes that reapportionment will be necessary every ten years.  That being the case, it follows that the Maine State Legislature

---

[1] At another point, the Democratic Party also characterized these population changes as the result of a "natural progression" or as a "natural shift." *Intervenor Brief* at 9.

3

knowingly adopted a scheme that would ensure that the first election cycle following the release of official Census data would result in a congressional election based on outdated data and questionable, if not unconstitutional, boundaries.  Such realities cannot be constitutionally justified based on mere theoretical and actuarial possibilities.  As Justice Oliver Wendell Holmes more broadly observed, "[t]he life of the law has not been logic: it has been experience."   The Mind and Faith of Justice Holmes, ed. M. Lerner (ed. 1943), p. 51.

   B.  **MAINE'S DELAYED CONGRESSIONAL REDISTRICTING SCHEME UNCONSTITUTIONAL AS APPLIED.**

Even if Maine's delayed congressional redistricting scheme is not unconstitutional *per se*, it is unconstitutional as applied.  On this point, the Plaintiffs and the State Defendants are in complete accord.  The 2010 Census has revealed a population disparity between the two districts which, had it been planned, would be too large to pass constitutional muster.  The Plaintiffs and the State Defendants agree that the decisions of the Supreme Court on apportionment among congressional districts allow only for the most minimal variations and the disparity that the Census has revealed over the last 10 years cannot be tolerated if it can be remedied.

All the parties recognize that there is no Supreme Court authority that directly controls the delayed apportionment question presented by the Maine redistricting scheme.   The Democratic Party, noting this, has framed the issue as follows:

> …a variance of .652% in Maine's congressional districts, which is not the product of  deliberate malapportionment but only the temporary result of passive population growth following a lawful apportionment during the ten-year period following that apportionment, meets the constitutional population equality requirements under all circumstances.

*Democratic Party Brief* at 11.

Plaintiffs do not agree with this characterization of the issue at hand but, even accepted *arguendo,* it fails. The Census is mandated by the Constitution for the purpose of allocating the proper number of representatives to each state. The very existence of this mandate presupposes that populations within and among the several states will, as the Democratic Party puts it, "inevitably" change every 10 years. Characterizing these population changes as "passive" in no way alters their import for congressional boundaries. Whether "passive" or "active" (if that is the proper contrast for "passive" as the Democratic Party uses that word), such population shifts require congressional boundary changes. There simply is no escape hatch in Article I, Section 2 for population shifts that result from natural population growth, whether active or passive—the obligation to reapportion remains binding.

The Democratic Party notes that the current congressional boundaries were drawn by the Maine Supreme Judicial Court employing the process set forth under Maine law. That the redrawing of the lines separating the two districts in 2003 was properly done is beside the point. The 2010 Census has demonstrated that those lines have become obsolete and, if not changed, they will result in the dilution of the Plaintiffs' votes in the next congressional election.

For the most part, the Democratic Party has cited Supreme Court decisions which have recognized that state governments can exercise some discretion in apportioning <u>state</u> district lines and can even indulge some delay in doing so. The U.S. Supreme Court has, of course, recognized the distinction between congressional and legislative districting, stating that, "whereas population alone has been the sole criterion of constitutionality in congressional districting under Art. I Sec. 2, broader latitude has been afforded the States under the Equal Protection Clause in state legislative redistricting . . . The dichotomy between the two lines has been consistently maintained." <u>Mahan v. Howell</u>, 410 U.S. 315, 322 (1973); <u>see also</u> <u>Gaffney v.</u>

Cummings, 412 U.S. 735, 741-742 (1973) ("We concluded that there are fundamental differences between congressional districting under Art. I and the Wesberry[2] line of cases on the one hand, and, on the other, state legislative reapportionments governed by the Fourteenth Amendment and Reynolds v. Sims and its progeny") (internal citation omitted). The latitude that the Supreme Court has recognized in state reapportionment is, quite simply, inapposite to congressional redistricting.

The Intervening Party's task is complicated by the absence of any clear rationale for the election-skipping delay built into Maine's congressional redistricting scheme. In their initial briefs, the parties provided the court with the threadbare legislative history on this change. Bereft of any clear legislative justification for the changes, the Intervening Party has been reduced to surmise. Without actually claiming this as the Legislature's rationale for the delay, Democratic Party observes that the delay "…provides time for policy makers and the state court to make a careful and thoughtful apportionment plan effectuating legitimate state policies…." It goes on to fret that, through this lawsuit, Maine now faces the possibility that an order may issue from this Court that, by "requiring redistricting during the remainder of this year, [would] threaten[]…to disrupt" its leisurely and placid pace of congressional reapportionment. *Democratic Party's Brief* at 7.

The Intervening Party's explanation of the effect, if not the intent, of the 1981 change, even if accepted as the Legislature's actual reason for adopting the delay, must give way to the imperative of ensuring, as the Supreme Court has mandated, that in federal congressional elections each voter must, to the extent practicable, count equally.

On this point, the Supreme Court has been clear. The standard for drawing congressional districts is absolute equality. See Wesberry v. Sanders, 376 U.S. 1, 7-8 (1964) ("as nearly as is

---

[2] Wesberry v. Sanders, 376 U.S. 1 (1964).

6

equal as practicable one man's vote in a congressional election is to be worth as much as another's"); Karcher v. Dagget, 462 U.S. 725 (1983) ("there are no *de minimis* population variations, which could practicably be avoided, but which nonetheless meet the standard of Art. I Sec. 2 without justification"); Miller v. Johnson, 521 U.S. 74, 98 (1997) ("absolute population equality is the paramount objective."). The standards for drawing state legislative plans are considerably less strict.

The Intervening Party tries to shore up its arguments by comparing the populations of (and the difference in population of) Maine's two Congressional Districts and the populations of congressional districts in other states. These comparisons are improper and entirely irrelevant. The disparities in representation among the states is a function of our federal system. Supreme Court decisions have addressed congressional district disparities within a given state.

Comparisons of representation in one state as compared to another is simply irrelevant to all identifiable reapportionment standards, including the very standard that the Intervening Party would have this Court apply (*i.e.*, the standard for reapportionment of state legislative districts). As the Defendants correctly have stated, the controlling issue is whether the disparities between Maine's two congressional districts "could be narrowed to more closely achieve the standard of equality established by the Supreme Court." (*State Defendants' Brief*. 9, 10-11 (citing Wesberry v. Sanders, supra; Kirkpatrick v. Priestler, 394 U.S. 526 (1969); Karcher v. Dagget, 462 U.S. 725 (1983)).) Data concerning the populations of congressional districts in other states is completely irrelevant.

Although there is no Supreme Court decision that has directly addressed whether a state may require the delay in the implementation of Census data to the extent of adhering to

demonstrably obsolete and unequal congressional district lines in an impending federal election, the logic of its decisions is clear.

Beyond those decisions, however, the records of the Constitutional Convention of 1787, themselves, reveal that the Founders believed prompt and timely apportionment of congressional districts was imperative. The government of the United States under the Articles of Confederation was, of course, unicameral and its members were not elected directly by the people. The delegates to the Constitutional Convention understood full well that the "first branch" they had under consideration—which would eventually become the House of Representatives—was a great innovation with no federal precedent. In structuring this institution, therefore, the Founders allocated representatives to the states. II Farrand, Records of the Federal Convention (1966) 13-14. Later in the Convention, James Madison acknowledged that the delegates' apportionment of representatives among the states was not (and could not) be precise. His notes on the Constitutional Convention show him frankly acknowledging that "[t]he last apportionment of Congrs., (sic) on which the number of Representatives was founded, was conjectural and meant only as a temporary rule till a Census should be established." *Id.* at 358.

The records of the Constitutional Convention plainly show that the delegates concluded that any delay in ascertaining reliable information for apportionment of representatives among the several states was intolerable. As originally introduced, the delegates envisioned a leisurely pace for moving from the "conjectural" assignment of representatives to numbers based on the Census. The resolution that proved to be the forerunner of Article I, Section 2, while requiring a Census, provided a leisurely six years from the first meeting of the first Congress for the completion of the Census. *Id.* 14. As adopted, however, Article I, Section 2 reduced that period from six to three years. U.S. Const., Art. I, Sec. 2. In short, as approved by the Constitutional

Convention, Article I, Section 2 ensured that only in this First Congress would the apportionment of representatives among the states be "conjectural;" thereafter and forever more they would be based on systematic Census data.

As the Supreme Court recognized in Wesberry, and as its extensive excerpts from the Constitutional Convention demonstrated, the Founders knew full well that the House of Representatives, directly elected by the people, would represent their will. Wesberry v. Sanders, supra at 9-16. Given the importance they ascribed to this institution coupled with their own clear decision to tolerate only one Congress in which the numbers of representatives among the several states would be uncertain, it is inconceivable that they would tolerate or condone federal elections being held with Congressional the boundaries of which have been proved by the very Census they mandated to diminish and dilute the votes of the people.

**III. PROMPT ENTRY OF AN ORDER GRANTING THE RELIEF REQUESTED IS NECESSARY GIVEN THE SHORT TIMEFRAME BEFORE THE 2012 ELECTION**

Plaintiffs respectfully request that this Court promptly enter an order giving the Maine state legislature adequate time to pass a reapportionment plan before the 2012 elections. The time frame for conducting congressional elections in Maine is set forth in 21-A M.R.S. § 335(2) - § 335(8) and § 339. Petitions are available for congressional candidates on January 1, 2012, and must be turned in no later than March 15, 2012, bearing the required number of signatures. The primary elections are to be held on the second Tuesday of June 2012. Accordingly, the state legislature must pass a reapportionment plan prior to January 1, 2012. Plaintiffs request that the Court enter an order requiring Defendants to present to the Court a new plan for constitutional congressional districts by or before December 1, 2011. This would provide sufficient time for the Court to redraw the congressional districts in the event that Defendants are unable to produce a constitutional plan and the Court itself must undertake the redrawing process.

### IV.   CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that the Court declare the State of Maine's current congressional districts unconstitutional under Article I, section 2 of the United States Constitution and enjoin Defendants from using the current congressional districts in any future primary or general election(s).  Plaintiffs also request that the Court order the Defendants to present to the Court a plan for new congressional districts by or before December 1, 2011.  Plaintiffs further request the Court to retain jurisdiction over this matter until such time as either Defendants produce a constitutional plan for congressional districts, or, if the Defendants are unable to produce a constitutional plan, the Court itself undertakes to redraw the congressional districts.  For the Court's convenience, a proposed order is attached.

DATED this 31st day of May, 2011.

>                             PLAINTIFFS WILLIAM DESENA AND
>                             SANDRA W. DUNHAM
>
>                             */s/ Timothy C. Woodcock, Esq.*
>                             Timothy C. Woodcock, Esq.
>                             EATON PEABODY
>                             80 Exchange Street
>                             P.O. Box 1210
>                             Bangor, ME  04402-1210
>                             (207) 947-0111
>                             twoodcock@eatonpeabody.com
>
>                             Attorneys for Plaintiffs

### CERTIFICATE OF SERVICE

I hereby certify that on this, the 31st day of May, 2011, I electronically filed the above document with the Clerk of Court using the CM/ECF system, which will send a copy of such to the following registered participants:

Paul Stern
Deputy Attorney General
Six State House Station
Augusta, Maine 04333-0006
Tel. (207) 626-8568
paul.d.stern@maine.gov

Janet T. Mills, Esq.
Preti Flaherty Beliveau & Pachios, LLP
45 Memorial Circle
P.O. Box 1058
Augusta, ME  04332-1058
Tel. (207) 623-5300
jmills@preti.com

                                                */s/ Timothy C. Woodcock, Esq.*
                                                Timothy C. Woodcock, Esq.
                                                EATON PEABODY
                                                Attorneys for Plaintiffs