UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| WILLIAM DESENA et al. )<br>    Plaintiffs )<br> )<br> ) | CIVIL ACTION |
| v. ) | NO.1:11-cv-117- |
| ) | GZS-DBH-BMH |
| ) | |
| STATE OF MAINE et al. )<br>    Defendants ) | |

**REPLY BRIEF OF INTERVENOR MAINE DEMOCRATIC PARTY**

    I.    Neither the statute nor the population deviations in the plan are *per se* unconstitutional or violative of federal statutes.

    Intervenor Maine Democratic Party concurs with the State Defendants that Maine's congressional redistricting scheme is not unconstitutional *per se*. Plaintiffs' assertion that the scheme is a *per se* violation of Equal Protection is wrong. The redistricting cases decided under the Equal Protection Clause – i.e, state legislative redistricting cases – have held that an overall range of less than 10% is prima facie valid under the Equal Protection Clause.  *See, e.g.,* White v. Regester, 412 U.S. 735 (1974) (upholding a total deviation of 9.9%); Gaffney v. Cummings, 412 U.S. 735 (1973) (upholding legislative districts with a maximum deviation of 7.83%); *see also,* Mahan v. Howell, 410 U.S. 315 (1973) (upholding a total deviation of 16.6%). The overall range of 1.3%  in the instant case is exemplary under Equal Protection standards.  In addition, Plaintiffs cannot say that there is no

1

scenario under which Maine's statute would be found constitutional. The statute therefore should be upheld.

The federal Reapportionment Act of 1929, codified as amended in 2 U.S.C. §2a, cited in Plaintiffs' brief, does not require the states to redraw congressional districts within a certain time period. Federal law makes automatic the apportionment of the 435 districts among the states, the distribution of congressional districts nationwide, upon certification of the population figures by the Secretary of Commerce, nothing more. It does not dictate a time frame for redistricting.

Plaintiffs' complaint does not allege a violation of this federal law, nor can one be construed on the facts of this case. To do so would be to confound the process of "apportionment," or assigning the number of districts for each state, with "redistricting," the process by which the states themselves draw the lines as they are given the liberty to do by federal law. Nothing in the federal statutes requires the states to redistrict within a particular timeframe.

Interestingly, although Congress has mandated in 2 U.S.C. §2c that the states elect representatives only from single-member districts and although Congress previously required that the districts be compact and contiguous, Congress has never mandated that the states draw district lines in the short time between the releases of the census data and the next congressional election. If Congress had thought it important to do so, it certainly could have and would have mandated the timing of congressional redistricting. The omission of this mandate buttresses Intervenor's argument that such a mandate does not exist.

> II. The small numerical disparity here is insufficient to require upsetting Maine's carefully constructed redistricting process.

Intervenor agrees with the State Defendants, brief, p. 12, that the issue presented by Plaintiffs' complaint has never been squarely presented to the United States Supreme Court. There is no case directly on point, that is, a case involving a statutory delay in congressional redistricting until the year ending in three, without more.

But Intervenor disagrees that Wesberry, Kirkpatrick and Karcher, *infra*, and other cases cited by Plaintiffs and Defendants dictate that Maine's new census figures automatically require a court-ordered expedited redistricting of the congressional districts.

None of the case law cited by the State and the Plaintiffs requires that the states redistrict within a particular time frame when there is no history of partisan gerrymandering, bad faith or constitutional violations, no change in the number of congressional districts and no dramatic malapportionment.

All of the cases cited are cases in which the courts respond to deliberate malapportionments, often in the face of past violations and allegations of partisan gerrymandering. Nearly all of them also involve much more dramatic and unjustified population variances than the 0.652% variance in the instant case.

In the watershed case of Wesberry v. Sanders, 376 U.S. 1 (1964), the Supreme Court struck down an apportionment in which the largest district had more than three times the population of the smallest district. In addition, the State of Georgia had not redistricted for several decades (the plan challenged in that case was enacted in 1931. *See* 376 U.S., 7). The case thus presented both a history of bad faith and a dramatic malapportionment, two

3

elements justifying the Supreme Court's unusual action in requiring redistricting. Neither of those justifications is present in the instant case.

In <u>Kirkpatrick v. Preisler</u>, 394 U.S. 526 (1969), the range struck down by the United States Supreme Court was 23,802 people, or 5.97%, far greater than the small population deviation present in Maine's current configuration. The Court stated, "[I]t is simply inconceivable that population disparities of the magnitude found in the Missouri plan were unavoidable." <u>Id</u>., 532. No such wide disparities exist based on the 2010 Maine census data.

<u>White v. Weiser</u>, 412 U.S. 783 (1973) the Supreme Court struck down a Texas redistricting plan with an overall range of 4.13%, substantially larger than the range here.

In <u>Karcher v. Daggett</u>, 462 U.S. 725 (1983), the Supreme Court did strike down districts with an order of magnitude similar to Maine's current deviations. However, that case did not involve the pure timing question presented here and the Supreme Court's decision did call for a case-by-case assessment of redistricting plans, along with their history and justifications.

<u>Vieth v. Pennsylvania</u>, 195 F.Supp. 2d 672 (2002) cited by Plaintiffs at p.11, as rejecting plan with a nineteen person variance, involved a redistricting that was required because of the loss of two seats in Congress. Significantly, despite the change in the number of districts, that court actually allowed the challenged plan, which was later repealed and found by the court to be unconstitutional, to remain in effect during the 2002 congressional elections. <u>Id</u>., 2-3, 6-7. In any event, the decision involved the court choosing between a number of competing plans with varying disparities following a reduction in the number of districts; it does not stand

4

for the proposition that a particular minimal deviation is always constitutionally required.

Farnum v. Burns, 548 F.Supp. 769 (1982) (DC RI), relied upon by the State, is also distinguishable from the present facts. In that case the three-judge court disallowed state senate elections in 1982 based on 1970 census figures which were "grossly disproportionate," having a total deviation of *88%* and an average deviation of *14%,* with population ratios of the largest to smallest districts of 2.35 to 1. The state offered no justification for such a deliberate and "shocking malapportionment." These facts are a far cry from the inadvertent shift in population between Maine's two congressional districts as devised by the Maine Supreme Judicial Court only eight years ago, resulting in a variance of 0.652%. *See also,* Licht v. Quattrocchi, 454 A.d2d 1210 (R.I.1982).

In Cox v. Larios, 300 F.Supp. 2d 1320 (N.D.Ga. 2004), *summarily aff'd,* 542 U.S. 947 (2004), a three-judge federal court struck down Georgia's post-2000 legislative redistricting plans because they violated the Equal Protection Clause. The case was brought by Republicans who argued that their rights under the Fourteenth Amendment had been deprived by the state legislative maps created in 2001 and 2002 by a then Democratically-controlled Georgia General Assembly. *Larios v. Cox*, 300 F. Supp. 2d 1320 (N.D. Ga. 2004). The Supreme Court refused to grant a stay of the decision prior to the 2004 elections. Cox v. Larios, 124 S. Ct. 1503 (2004). In the 2004 elections, Republicans gained control of the Georgia Legislature. The Supreme Court summarily affirmed the decision of the three-judge court. Cox v. Larios, 124 S. Ct. 2806 (2004). At issue in that case was a pattern of deliberate discrimination, not a passive shift in population as is present here.

5

Anne Arundel County Republican Cent. Comm. v. State Advisory Board, 781 F.Supp. 394 (D.Md. 1991) involved a population variance of ten people, but that number was not required by the court; the court simply dismissed a claim of partisan gerrymandering as being insubstantial on the facts of that case, regardless of the population deviation. The court neither approved nor disapproved of the particular variance, as this case was not a population equality case.

In Graham v. Thornburgh, 207 F.Supp.2d 1280 (D.C.Kan. 2002), the court rejected challenges to a congressional plan enacted by the legislature over other plans with smaller variances. The case does not stand for the proposition that a variance of twenty-nine people is constitutionally required, as the population variance was simply not an issue in the case.

People ex rel. Salazar v. Davidson , 79 P.3d 1221 ( Col. 2003), also relied upon by the State Defendants, does not support their argument that Maine's scheme is unconstitutional as applied. As a result of the 2000 census, Colorado gained an additional congressional seat. Because the Colorado General Assembly failed to agree upon a congressional redistricting plan in time for the 2002 elections, a Colorado state court drew a map. In 2003 the Republican-controlled General Assembly pushed through a new districting map in the closing days of the legislative session. The map was challenged, and the Colorado Supreme Court held that the new plan was unconstitutional because under Colorado's constitution, congressional boundaries could only be drawn once in a decade. The Supreme Court denied the State's application for certiorari, with the dissent arguing that under Article I, Section 4, Clause 1 of the Constitution, the state General Assembly has the ultimate authority to draw congressional district

boundaries. Colo. Gen. Assembly v. Salazar, 124 S. Ct. 2228 (2004). This case simply does not address the fact situation here.

Another state case cited by Plaintiffs, Honsey v. Donovan, 236 F.Supp. 8 (D.Minn.1964) is inapposite for similar reasons. Honsey involved the state's first redistricting effort in many years and the validity for the 1966 elections of a plan with major and pervasive malapportionment based on 1950 figures, with the senate districts varying in size as much as four to one. These facts are not similar to those of this case.

Likewise, the case of Sixty-seventh Minn. Senate v. Beens, 406 U.S. 187 (1972), dealt with major population inequalities that simply do not exist here.

Two cases more recent and more on point are: Turner v. Arkansas, 784 F.Supp. 585 (E.D.Ark.1991), *summarily aff'd*, 504 U.S. 952 (1991), which upheld a congressional plan with a deviation of 0.735%, larger than the deviation in the present case, and Mississippi State Conference of NAACP v. Barbour, No. 3:11 cv 159, slip op. (DC, So.Dist.Miss., 2011), discussed in Intervenor's brief at 18-19.

Turner upheld congressional districts with an overall range deviation of 4,321 people, or 0.735% total maximum deviation from the ideal, and the United States Supreme Court affirmed that ruling. In the Mississippi case, the decision did not quantify the deviations in the districts that the court permtted to be used for the next election; however, an affidavit submitted by the plaintiffs asserted that the total range of population deviation percentage in the house districts was *134.35%*. See Affidavit of Thomas L. Plunkett in Mississippi, supra, Document 18-1, attached hereto as Exhibit A.

The dictum in Growe v. Emison relied upon by Plaintiffs and the State Defendants is more than appropriate for those states with historical

7

animosity to the constitutional "one person, one vote" provision and for those states with fulltime and/or year-round legislative sessions in which redistricting may be taken up at any time.

The uniqueness of Maine's system – see "Redistricting Law 2010" by the National Conference of State Legislatures for a digest of state laws – is based on our legislative calendar, on our June primary season and on the timing of the census data.

Maine's Constitution requires that the commission to do redistricting commence its work within three calendar days of the legislature convening, Art.IV, pt.3, §1-A, Maine Constitution, which would have been by December 6, 2010, if redistricting had been done during the current legislative session. Maine law and Constitution then require that the commission submit an apportionment plan to the legislature within 120 days of convening, which would have been March 31, 2011, and that the legislature enact the plan, or a plan of its own, by a supermajority vote in both houses within ten calendar days after that, or by April 10, 2011, if the apportionment had been conducted this year. The Maine Supreme Judicial Court would then have sixty days to do the redistricting on its own if the legislature failed to enact or the Governor failed to approve a plan. None of this constitutional timeline makes sense given the fact that the census figures are not required to be provided to the state until April 1, 2011, and in fact were received on March 24, 2011, at a time when the legislature was more than half way through its current session.

The redistricting process in Maine has been insulated from the throes of extreme partisanship that have driven the court decisions in so many other states. It is a well respected process and one that takes time to perfect.

It is true, as mentioned in Growe v. Emison, 507 U.S. 25, 35, that

8

redistricting sometimes must be done in the most urgent circumstances. However, this is not one of those circumstances. The alleged dilution of the vote of the two citizens of Cape Elizabeth is not substantial. There is no history of deliberate discrimination, of bad faith, of a change in the number of districts or of partisan gerrymandering such as might warrant urgent remedial action by a federal court.

## Conclusion

There is no precedent for the question presented in this case: whether a state's careful and methodical decennial redistricting process may be found to be unconstitutional solely because it delays redistricting until after the next election, in the face of a modest population disparity that is not the result of any deliberate actions or misconduct by the state.

Plaintiffs' drastic demand—that the entire statutory scheme for congressional redistricting in Maine be invalidated—should be rejected by the court. Plaintiffs state cryptically that "[u]ndertaking redistricting at any other time would make the event a discretionary one subject to the will of the state officials in whom this important responsibility has been placed by the citizens of Maine." Plaintiff's brief, p.8. Plaintiffs' demand, however, is that Maine's entire redistricting process be discarded and that the will of the current officeholders dominate the redistricting procedure, with none of the sophisticated oversight and safeguards that Maine's scheme has so successfully brought to bear on this complicated political effort.

Plaintiffs urge this Court to invalidate Maine's entire unique system of redistricting, which is designed specifically to transcend partisan politics and to allow redistricting to occur in a fair and impartial way, reserving the state's highest court as the final aribiter of the lines. Unfortunately, if

9

plaintiffs have their way, the entire statutory scheme, carefully constructed and thoughtfully implemented, will be disregarded and partisan politics will once again hold sway in Maine with the majority party, whose officers are the defendants in this case, dictating Maine's congressional lines to suit their own purposes. Such a result should not be countenanced by this Honorable Court.

        Respectfully Submitted,
        Maine Democratic Party
        By Their Attorneys,
        PRETI FLAHERTY BELIVEAU &
        PACHIOS, LLP

By:   /s/ Janet T. Mills
       Janet T. Mills

       45 Memorial Circle
       P. O. Box 1058
       Augusta, ME  04332-1058
       Telephone:  (207) 623-5300
       Facsimile:   (207) 623-2914

## **CERTIFICATE OF SERVICE**

I, Janet T. Mills, hereby certify that I electronically filed the Reply Brief of Intervenor Maine Democratic Party with the CM/ECF system, which will send notification of such filing(s) electronically to the following: Timothy C. Woodcock at twoodcock@eatonpeabody.com, William J. Schneider, Attorney General at william.j.schneider@maine.gov, and Paul Stern, Assistant Attorney General at paul.d.stern@maine.gov.

Dated: May 31, 2011

                                            Respectfully Submitted,
                                            Maine Democratic Party
                                            By Their Attorneys,
                                            PRETI FLAHERTY BELIVEAU &
                                            PACHIOS, LLP

By:   /s/ Janet T. Mills
          Janet T. Mills

          45 Memorial Circle
          P. O. Box 1058
          Augusta, ME 04332-1058
          Telephone: (207) 623-5300
          Facsimile: (207) 623-2914