```
              UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MAINE


           CIVIL ACTION NO. 1:11-cv-117


              WILLIAM DESENA AND
               SANDRA W. DUNHAM,

                   Plaintiffs,

                       v.

              STATE OF MAINE ET AL.,

                   Defendants.
           _____

              Before Selya,* Circuit Judge,
           Hornby and Singal, District Judges.
           _____


              MEMORANDUM AND ORDER

                 June 21, 2011

           _____
```

**SELYA**, <u>Circuit Judge</u>.  This case, brought in the aftermath of the 2010 decennial census, posits that population shifts have made Maine's two congressional districts unequal and that, given Maine's redistricting format, the disparity will not be rectified before the 2012 election.  The upshot, the plaintiffs say, is unconstitutional vote dilution.

---

* Hon. Bruce M. Selya, of the United States Court of Appeals for the First Circuit, sitting by designation.

To put this claim in perspective, we begin with an overview of Maine's approach to congressional apportionment. Following each federal decennial census, Maine (like every other state) receives population data and an allotment of congressional seats from the federal government. See 2 U.S.C. § 2a(a)-(b). For many years, Maine traveled a well-worn path, see Nat'l Conf. of State Legis., Redist. Law 2010 180-86 (2009), and redrew district lines in the interlude between the release of the official census data and the next congressional election. See Opinion of the Justices, 283 A.2d 234, 235 (Me. 1971).

In 1975, Maine veered from this path. The genesis of this deviation can be traced to an amendment to the state constitution requiring that state legislative reapportionment be completed in 1983 and at ten-year intervals thereafter. See Me. Const. art. IV, pt. 2, § 2; see also In re 1983 Legis. Apport. of House, Senate, and Cong. Dists., 469 A.2d 819, 822-24 (Me. 1983). The legislature subsequently enacted a statute that made the same time line applicable to congressional redistricting. See Me. Rev. Stat. tit. 21-A, § 1206.

Under this blueprint, the legislature convening in the third year after each decennial census is tasked with establishing a bipartisan apportionment commission (the Commission). Id. § 1206(1). The Commission is charged with reviewing the census data and submitting a recommended redistricting plan. Id. If the

legislature fails to adopt either the Commission's plan or a surrogate within a prescribed time frame, the obligation to reapportion becomes the responsibility of the Maine Supreme Judicial Court.  Id. § 1206(2).  In either event the redrawn districts take effect for use in the election cycle that occurs in the fourth calendar year following the census year.  For example, when the results of the 2000 census were received, reapportionment took place in 2003; and the new district lines (congressional and legislative) were first used in the 2004 election cycle.

At all times material hereto, Maine has been allotted two seats in the United States House of Representatives.  According to the 2000 census, it had 1,274,923 residents.  After a legislative stalemate, the Supreme Judicial Court drew the district lines.  See In re 2003 Apport. of the State Senate and U.S. Cong. Dists., 827 A.2d 844, 845 (Me. 2003).  As apportioned, the first congressional district contained 637,450 residents and the second district contained 637,473 residents.  These districts were used for the 2004, 2006, 2008, and 2010 congressional elections.

In March of 2011, Maine received the 2010 decennial census data from the federal government.  These figures revealed that the state's population had swelled to a total of 1,328,361 residents.  The population of the first district had grown to 668,515, whereas the population of the second district had only

increased to 659,846.  Thus, the population differential between the two districts had widened from 23 residents to 8,669 residents.

The next regularly scheduled congressional election will occur in November of 2012.  Pursuant to Maine law, the lines demarcating its two districts will not be redrawn until 2013.

The plaintiffs, William Desena and Sandra Dunham, are residents of, and registered voters in, Cape Elizabeth (a community that lies wholly within Maine's first congressional district).  Four days after Maine received the 2010 census data, they sued the state, a state agency, and a coterie of state officials.[1]  They challenge the constitutionality of Maine's congressional redistricting scheme on its face and as applied.  The district court found the constitutional challenge colorable and, upon its certification to that effect, the Chief Judge of the United States Court of Appeals for the First Circuit convened a three-judge court.  See 28 U.S.C. § 2284(a).  The court allowed the Maine Democratic Party to intervene as a defendant.

Following a preliminary hearing, the parties stipulated to the facts and engaged in extensive briefing.  On June 9, 2011, the court heard oral arguments and, at the conclusion of the hearing, ruled ore tenus that Maine's current congressional

---

[1] With a view toward Eleventh Amendment immunity, see U.S. Const. amend. XI, the plaintiffs subsequently dropped both the state and the state agency as defendants, and are proceeding only against the individual defendants.  See Ex parte Young, 209 U.S. 123, 155-56 (1908).

-4-

apportionment is unconstitutional and that the 2012 congressional election cannot go forward under that apportionment.  The court informed the parties that it would issue an explicative opinion at a later date.  This rescript is intended as the fulfillment of that promise.[2]

Refined to bare essence, the plaintiffs claim that the Maine legislature has a constitutional obligation, following the receipt of new decennial census data, to reapportion the state's congressional districts in time for the next election (the facial challenge) and that, in all events, the legislature has an obligation to reapportion the current congressional districts in light of received data from the 2010 census showing a significant inter-district disparity in population (the as-applied challenge).  The state defendants concede the force of the as-applied challenge, but the intervenor insists that Maine's scheme passes constitutional muster both on its face and as applied.  Because we conclude, on the facts of this case, that the state's failure to redraw the district lines in time for the 2012 election violates Article I, Section 2 of the Constitution, we need not address the plaintiffs' facial challenge.

Congressional apportionment demands an exacting balance.  The Constitution requires that each congressional district within

---

[2] The court solicited, on a tight time line, submissions addressing how best to remedy the constitutional infirmity.  That aspect of the case is currently in progress.

a state should be equal in population.  U.S. Const. art. I, § 2; see id. amend. XIV, § 2.  While absolute equality is not required — the command of Article I, Section 2 is aspirational rather than literal — the state must seek "to achieve precise mathematical equality."  Kirkpatrick v. Preisler, 394 U.S. 526, 530-31 (1969). The goal is that "as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's." Wesberry v. Sanders, 376 U.S. 1, 7-8 (1964).  The goal, then, is to make congressional districts within the state as nearly equal as is practicable under all the circumstances.

The Supreme Court has choreographed a two-step pavane for demonstrating that a state's congressional districts do not achieve this goal.  First, a challenger must show that a population disparity exists, which "could have been reduced or eliminated altogether by a good-faith effort to draw districts of equal population."  Karcher v. Daggett, 462 U.S. 725, 730 (1983).  Once the challenger makes that showing, the devoir of persuasion shifts to the party defending the apportionment to justify the population differential.  Kirkpatrick, 394 U.S. at 531-32.  If no such showing is made, the apportionment fails.  We follow this burden-shifting model here.

The initial question is whether a significant population disparity exists.  The plaintiffs have the burden of proof on this issue.  Karcher, 462 U.S. at 730-31.  Where, as here, a numerical

disparity exists, the plaintiffs' burden is not a heavy one: the Supreme Court has explained that, in the context of congressional apportionment, even "de minimis population variations" offend the command of Article I, Section 2.  Id. at 734.

The existence of a numerical disparity is beyond question.  According to the 2010 census, Maine's first congressional district has 8,669 more residents than Maine's second congressional district.  This amounts to a deviation of 0.6526 percent.[3]  This variation is significant; it is greater, in both absolute and percentage terms, than variances previously deemed unconstitutional by the Supreme Court in congressional apportionment cases.  See, e.g., Karcher, 462 U.S. at 728, 734 (rejecting disparity of 3,674 residents and deviation from ideal of 0.1384 percent); Kirkpatrick, 394 U.S. at 529-30 & n.1 (rejecting deviation from ideal of 0.19 percent as not per se de minimis).

In an effort to blunt the force of this reasoning, the intervenor argues that the disparity here falls within acceptable limits because the Court occasionally has approved larger variances.  See, e.g., White v. Regester, 412 U.S. 755, 764 (1973); Gaffney v. Cummings, 412 U.S. 735, 740-41 (1973).  This argument

---

[3] This "deviation from the ideal" represents the percentage variation of Maine's current districts from the ideal population (664,180.5) that a district in the state would have based on the 2010 census figures.  This calculation serves as a typical basis for comparison in vote dilution cases.  See, e.g., White v. Weiser, 412 U.S. 783, 785 (1973); Mahan v. Howell, 410 U.S. 315, 323-24 (1973).

rests on quicksand. The cases to which the intervenor adverts are, without exception, cases dealing with the reapportionment of state legislative districts, not congressional districts. This difference renders those cases inapropos. States enjoy materially greater latitude in apportioning state legislative districts — a process vetted under the general provisions of the Equal Protection Clause — than they do in apportioning congressional districts — a process vetted under the specific provisions of Article I, Section 2. See White v. Regester, 412 U.S. at 763; see also Brown v. Thomson, 462 U.S. 835, 850 n.2 (1983) (O'Connor, J., concurring).

In yet another effort to lessen the impact of the numerical disparity, the intervenor seeks to contrast the size of Maine's congressional districts with the size of congressional districts elsewhere (say Montana, which boasts a single congressional district of nearly 1,000,000 residents). This is a red herring. In an Article I, Section 2 analysis, interstate comparisons are irrelevant. No less an authority than the Supreme Court has declared that "the Constitution itself, by guaranteeing a minimum of one representative for each State, made it virtually impossible in interstate apportionment to achieve the standard imposed by Wesberry." Wisconsin v. City of New York, 517 U.S. 1, 14-15 (1996). That impediment has no bearing on a state's ability to make its own congressional districts uniform in size (or as near thereto as may be practicable).

To be sure, showing a significant numerical disparity, without more, does not satisfy the plaintiffs' burden. At the first step of the pavane, the plaintiffs also must show that the disparity was not "unavoidable despite a good-faith effort to achieve absolute equality." Kirkpatrick, 394 U.S. at 531.

In the circumstances at hand, this showing is child's play. The 2010 census figures were made available to Maine in March of 2011 — more than nineteen months before the 2012 election. Notwithstanding the availability of these new figures, Maine has not undertaken any effort to ameliorate the evident inequality in population between its two congressional districts. The only barriers to such remedial action are self-imposed. It follows from these facts that the plaintiffs have carried their burden of showing that the disparity is not unavoidable. Simply put, Maine's congressional districts, as they presently stand, do not achieve "the paramount objective" of population equality with respect to the upcoming 2012 election cycle. Karcher, 462 U.S. at 732.

The plaintiffs' "success in proving that the [current apportionment] was not the product of a good-faith effort to achieve population equality means only that the burden shift[s] to the State to prove that the population deviations in its plan were necessary to achieve some legitimate state objective." Id. at 740; see White v. Weiser, 412 U.S. 783, 795 (1973). The Supreme Court has not spelled out the full range of justifications that might

suffice to dodge this bullet. It has, however, noted that "[a]ny number of consistently applied legislative policies might justify some variance, including, for instance, making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent Representatives." Karcher, 462 U.S. at 740. Even so, only small deviations may be justified and the greater the deviation, the more compelling the justification must be. Id. at 740-41.

For their part, the state defendants concede the absence of any constitutionally adequate justification. The intervenor, however, advances several reasons for concluding that the disparity, though significant and easily avoidable, is nevertheless justified. All of these reasons lack force.

The intervenor's most bruited claim is that the bona fides of the process undertaken in 2003 deserve respect. This claim is unavailing. Although we do not question the legitimacy of the state's earlier process, the origins of the existing district lines are immaterial here. What counts is that the available 2010 census figures show conclusively that the two congressional districts are now malapportioned and that sufficient time exists to correct that malapportionment.

Next, the intervenor suggests that a delay in rectifying the newly emergent malapportionment is acceptable (and, thus, justifies the use of the current districts in 2012) because natural

population shifts inevitably result in vote dilution from election to election.  Cf. Gaffney, 412 U.S. at 746 ("District populations are constantly changing, often at different rates in either direction, up or down.").  We disagree.  The phenomenon of a continually shifting population is omnipresent and, thus, could always be used to justify a delay in reapportionment.  Such a result would eviscerate the promise of Article 1, Section 2.  We hold, therefore, that the ebb and flow of population in the years between decennial censuses cannot justify a state in ignoring updated census figures that, if used, would enable it to approach more closely the ideal of mathematical equality.

        The case law is consistent with this view.  See Karcher, 462 U.S. at 732; see also Georgia v. Ashcroft, 539 U.S. 461, 488 n.2 (2003) ("When the decennial census numbers are released, States must redistrict to account for any changes or shifts in population.").  Where, as here, there is ample time to ameliorate a significant population disparity between congressional districts revealed by a new decennial census, the Constitution obliges a state to act in time for the next election.  Maine has not fulfilled this obligation.

        Finally, the intervenor insists that, notwithstanding the existence of a significant disparity, there is no authority for the proposition that a state must redraw congressional district lines in the interval between the release of decennial census data and

the next election.  Rather, the policies supporting Maine's carefully constructed redistricting process, laudably designed to prevent partisan gerrymandering, are worthy of deference and, therefore, justify the state in using the 2010 census figures more deliberately in revamping its congressional district lines (with the result that reapportionment will be delayed until after the 2012 election).  This thesis is unpersuasive.

It is true that no Supreme Court case has squarely addressed the question of how long a state may delay congressional reapportionment after it receives decennial census data.  But certain propositions follow inexorably from the Court's interpretation of the mandate that Article I, Section 2 imposes — and framing the issue solely as a matter of timing distorts that interpretation.  Once a court finds a violation of the right to equal voting power, it must order the state to redress the violation by promptly redrawing the congressional district lines to achieve the equality that the Constitution demands.  See, e.g., Farnum v. Burns, 548 F. Supp. 769, 773 (D.R.I. 1982) (three-judge court) ("[O]pinions of the Supreme Court indicate that a state can constitutionally be compelled to reapportion in time for the first election after a census, even where the existing reapportionment scheme is less than ten years old."); Flateau v. Anderson, 537 F. Supp. 257, 265 (S.D.N.Y. 1982) (three-judge court) (similar); see also Ashcroft, 539 U.S. at 488 n.2 ("[I]f the State has not

redistricted in response to the new census figures, a federal court will ensure that the districts comply with the one-person, one-vote mandate before the next election.").  Constitutional violations, once apparent, should not be permitted to fester; they should be cured at the earliest practicable date.

So it is here: the current apportionment reflects a variance that is both avoidable and unjustified by legitimate state concerns.  Given its statutory time line, Maine will default on its constitutional obligation to remedy that disparity as expeditiously as practicable unless this court orders otherwise.  That is a default that we cannot allow to occur.  See Growe v. Emison, 507 U.S. 25, 34 (1993); Wesberry, 376 U.S. at 18; Black Political Task Force v. Galvin, 300 F. Supp. 2d 291, 316 (D. Mass. 2004) (three-judge court).

The short of it is that no party has advanced a compelling reason for permitting the 2012 congressional election to proceed despite a significant, unjustified, and easily correctable population variance between the two congressional districts.  Consequently, the state must undertake, here and now, a good-faith effort to achieve numerical equality, as nearly as may be practicable, between the districts in time for the next election.

We need go no further.  Maine's congressional districts, as they stand, are malapportioned and violate Article I, Section 2

of the Constitution.[4]  The district lines must be redrawn prior to, and for the purpose of, the 2012 congressional elections.  We will, by separate order, approve a plan and timetable for accomplishing this objective; and we will retain jurisdiction for that purpose.

**Settle Order on Notice**.


                          /s/ Bruce M. Selya
                          U.S. Circuit Judge


                          /s/ D. Brock Hornby
                          U.S. District Judge


                          /s/ George Z. Singal
                          U.S. District Judge

     Dated this 21st day of June, 2011.

---

[4] We take no view on the question of how (if at all) our finding that Maine's congressional districts violate Article I, Section 2 affects Maine's statutory scheme for reapportionment of the state legislature.  Legislative redistricting must be analyzed under a different standard, see Reynolds v. Sims, 377 U.S. 533, 577-78 (1964); see also U.S. Const. amend. XIV, § 2, and no challenge to the apportionment of legislative districts is before us.